**GALAXY INTERNATIONAL, INC., Plaintiff,**

v.

**WHITE STORES, INC., Defendant.**

**Civ. A. No. 80–517.**

United States District Court, W. D. Pennsylvania.

Nov. 14, 1980.

James G. Gordon, Wirtz & Smith, Pittsburgh, Pa., for plaintiff.

Dan Altman, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for defendant.

## OPINION

COHILL, District Judge.

### FACTS

Galaxy International, Inc., a Pennsylvania corporation having its principal place of business in Pittsburgh, Pennsylvania, has filed an action in the Western District of Pennsylvania for breach of contract against White Stores, Inc., a Tennessee corporation having its principal place of business in Knoxville, Tennessee. Galaxy International, Inc. ("Galaxy") engages in the business of buying and selling beef throughout the United States. White Stores, Inc. ("White"), in the ordinary course of its business as a food retailer, enters into contracts to purchase quantities of beef from various sellers throughout the United States. The plaintiff alleges that it sustained damages in the amount of $17,210 as a result of a breach by the defendant of an oral contract for the purchase of beef chunks. This Court has subject matter jurisdiction over Galaxy's lawsuit pursuant to 28 U.S.C. § 1332(a) (1976), which bestows original jurisdiction on the district courts over all civil actions where the amount in controversy exceeds $10,000 and the parties are citizens of different states.

White owns and operates forty–three supermarkets in Tennessee. It does not own any property or operate any stores beyond the borders of that state, and it is not qualified to do business in Pennsylvania as a foreign corporation. In early December, 1979, Guy Roberts ("Roberts") of Ed Morris Brokerage Co. ("Morris Brokerage"), a meat broker having its principal place of business in Nashville, Tennessee, informed Edward Simpson ("Simpson"), a meat buyer for White, that Morris Brokerage had a seller that would supply three loads of beef chunks to White for $1.42 per pound delivered. Simpson told Roberts that White would purchase the beef chunks at the quoted price.

Morris Brokerage notified the seller, Galaxy, that Roberts had found a buyer for the meat. Galaxy sent a written confirmation of the sale to White, but White never signed the document and it did not communicate directly with Galaxy about this purchase. The three loads of beef, which originated in South America, entered the United States in Florida and were shipped directly to Knoxville. White, after determining upon inspection that the beef was not merchantable because of its very dark color, rejected all of the meat. Galaxy subsequently procured a second buyer, which purchased the beef at $1.29 per pound. The filing of the present action followed.

### Procedural Posture

Galaxy filed its complaint against White on April 17, 1980, and an amended complaint on May 1, 1980. White responded on May 27, 1980 by filing a motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer for improper venue. Both parties submitted briefs and affidavits in support of their positions on the defendant's motion, and we heard oral argument on the matter.

### Venue

We first will address White's allegation that proper venue for Galaxy's action does not lie in the Western District of Pennsylvania. The defendant bases its alle-

gation on 28 U.S.C. § 1391(c) (1976), which provides that "[a] corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes." White, reading section 1391(c) as a limitation on venue in lawsuits against corporations, argues that Galaxy may not sue the defendant in this judicial district because the defendant is neither licensed to do business in Pennsylvania nor is it doing business in the Western District of Pennsylvania. Galaxy responds that proper venue does lie in this district because White is doing business in the Western District of Pennsylvania.

We do not find it necessary to resolve the factual question of whether or not White is doing business in this judicial district because we believe that the defendant erred when it read section 1391(c) in isolation. Section 1391(a) of Title 28 of the United States Code provides that "[a] civil action wherein jurisdiction is founded only on diversity of citizenship may ... be brought only in the judicial district where all plaintiffs or all defendants reside, or in which the claim arose." Subject matter jurisdiction in the present case rests solely on diversity of citizenship, and the plaintiff resides in the Western District of Pennsylvania. "Section 1391(c) does not limit the choice of venue made available by other statutes and does not require a corporation to be sued only in one of the districts in which the corporation is deemed to reside under that provision. In a diversity case against a corporation[,] suit still may be brought in the district in which all plaintiffs reside...." C. Wright, A. Miller & E. Cooper, 15 *Federal Practice and Procedure* § 3811, at 57 (1976) (footnote omitted). *See Strick Corp. v. Cravens Homalloy (Sheffield) Ltd.*, 352 F.Supp. 844, 848 (E.D.Pa. 1972); *Campbell v. Triangle Corp.*, 336 F.Supp. 1002, 1007–08 (E.D.Pa.1972). Therefore, we find that venue does lie in the Western District of Pennsylvania for Galaxy's lawsuit against White.

*In Personam Jurisdiction*

■ The defendant asserts that even if venue is proper in the Western District of Pennsylvania, the plaintiff cannot obtain in personam jurisdiction over the defendant in this district. "There ... exists an overwhelming consensus that the amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." *Arrowsmith v. United Press International*, 320 F.2d 219, 223 (2d Cir. 1963) (footnote omitted). *See also* Fed.R.Civ.P. 4(e). Section 5322 of Title 42 of the Pennsylvania Consolidated Statutes controls the exercise of in personam jurisdiction over nonresident corporate defendants by the federal district courts that sit within Pennsylvania. *See Sterling Industrial Corp. v. Telephone, Inc.*, 484 F.Supp. 1294, 1296–97 (W.D.Mich.1980); *Donner v. Tams–Witmark Music Library, Inc.*, 480 F.Supp. 1229, 1231–32 (E.D.Pa. 1979). This section provides in relevant part that "the jurisdiction of the tribunals of this Commonwealth shall extend to all persons ... to the fullest extent allowed under the Constitution of the United States and may be based on the most minimum contact with this Commonwealth allowed under the Constitution of the United States." 42 Pa.Cons.Stat.Ann. § 5322(b) (Purdon's Pamphlet 1980). Thus, the state statute impliedly refers us back to "the evolution of substantive jurisdictional due process as expressed by the United States Supreme Court." *Proctor & Schwartz, Inc. v. Cleveland Lumber Co.*, 228 Pa.Super. 12, 18, 323 A.2d 11, 14 (1974).

"The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). A federal district court, which has in personam jurisdiction in diversity cases that is coextensive with the in personam jurisdiction of the forum

state's courts, likewise must recognize the limitations that due process imposes when a plaintiff attempts to obtain an in personam judgment against a nonresident defendant. *See Arrowsmith v. United Press International*, 320 F.2d 219 (2d Cir. 1963); *Partin v. Michaels Art Bronze Co.*, 202 F.2d 541 (3d Cir. 1953). The Supreme Court's current approach to the permissible exercise of in personam jurisdiction has evolved from the core principle that "due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Company v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945).

The concept of minimum contacts performs two functions: It protects the defendant from incurring an excessive burden as a result of litigating in a distant forum, and it protects the federal system by limiting the ability of each state to infringe on the interests of another state through judicial action. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980). The latter function has its origin in one of the fundamental tenets of the Constitution. "[T]he Framers ... intended that the States retain many essential attributes of sovereignty, including, in particular, the sovereign power to try causes in their courts. The sovereignty of each State, in turn, implied a limitation on the sovereignty of all of its sister States...." *Id.* at 293, 100 S.Ct. at 565. Therefore,

> [e]ven if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism,

may sometimes act to divest the State of its power to render a valid judgment. *Id.* at 294, 100 S.Ct. at 565.

Galaxy contends that White has sufficient contacts with Pennsylvania to justify a Pennsylvania court's interest in the case and to establish the reasonableness of requiring White to travel to Pennsylvania to defend the action. Although disagreeing about the significance of White's contacts with Pennsylvania, the parties do agree on the extent of those contacts. During 1978 and the first half of 1979, Harry Schneider ("Schneider"), the president of Galaxy, placed approximately ten telephone calls from Pittsburgh to Edward Simpson in Knoxville, Tennessee. In these conversations, Schneider attempted to solicit purchase orders from White for beef that Galaxy could supply. None of these conversations resulted in a sale.

In October, 1979, White made two purchases of beef from Galaxy. In early October, Galaxy informed Morris Brokerage that it had a shipment of beef available for sale. Morris Brokerage, located in Nashville, Tennessee, contacted White in Knoxville about the shipment; White agreed to purchase the beef. Galaxy mailed a confirmation of the order to White, but White did not sign the confirmation nor did it telephone Galaxy about the transaction. White accepted the beef, which did not come from Pennsylvania, and sent the purchase price to Galaxy. Galaxy then paid a commission to Morris Brokerage, in accordance with the practice in the wholesale beef industry that the seller pays the commission to the independent broker. During the course of this transaction, White's only contacts with Pennsylvania came when it received a confirmation from Galaxy's Pittsburgh office and when it sent the purchase price to Galaxy's Pittsburgh office.

On October 17, 1979, Galaxy telephoned Edward Simpson to solicit another purchase order. Simpson, acting on behalf of White, agreed to purchase two loads of beef. Galaxy issued a written confirmation of the order, which Simpson signed and returned. According to the terms contained in the

confirmation, Pennsylvania law would control any dispute that arose from the contract. White accepted the beef, which did not come from Pennsylvania, and it sent the purchase price to Galaxy's office in Pittsburgh. During the course of this second transaction, White's contacts with Pennsylvania consisted of receiving a telephone call from Pennsylvania, receiving the written confirmation from Pennsylvania, mailing the signed confirmation to Pennsylvania, agreeing to have Pennsylvania law control any disputes arising from the contract and sending the purchase price to Pennsylvania.

The aborted transaction that gave rise to the present case occurred in December, 1979. Early in that month, Galaxy informed Morris Brokerage that it had three loads of beef available for sale. Morris Brokerage contacted Edward Simpson about the three loads. Simpson, as an agent for White, agreed to purchase the beef. Galaxy sent a confirmation of the sale to White, which did not sign or return it. The three loads of beef, which never entered Pennsylvania, were rejected by White upon delivery. Following White's rejection, Harry Schneider telephoned Simpson to learn the reason behind White's action. If White had accepted these loads of beef, it would have sent the purchase price to Galaxy's office in Pittsburgh. Galaxy then would have paid a commission to Morris Brokerage. During the course of this uncompleted transaction, White's contacts with Pennsylvania consisted of receiving a confirmation from Galaxy's Pittsburgh office and receiving a telephone call from Galaxy's Pittsburgh office.

Galaxy solicited all three of White's orders in Tennessee, twice contacting White through Morris Brokerage and once contacting White directly. Morris Brokerage, an independent brokerage company, was not acting as White's agent when it arranged the two purchase orders. White did not send purchasing agents or make telephone calls into Pennsylvania in connection with the orders that it placed with Galaxy.

The plaintiff advances two grounds that it alleges would support this Court's exercise of in personam jurisdiction over the defendant. First, Galaxy contends that White had sufficient contacts with Pennsylvania arising from the incomplete transaction of December, 1979, to justify a court sitting within Pennsylvania to require White to travel to Pennsylvania to litigate a case involving that transaction. Second, it argues that the aggregate of White's business contacts with Pennsylvania during 1978 and 1979 make it reasonable for a court sitting within Pennsylvania to exercise in personam jurisdiction over White in a case that arose from one of those business contacts.

*Contacts Involving the Incomplete Transaction*

■ We first will consider Galaxy's contention that the facts surrounding the aborted transaction contain sufficient contacts between White and the Commonwealth of Pennsylvania to permit a court sitting within Pennsylvania to require White to travel to the Commonwealth to defend an action involving that transaction. "[A] determination of whether or not the 'minimum contacts' of a foreign corporation with a particular state are sufficient to make the corporation constitutionally amenable to process in that state must inevitably be made on an ad hoc case–by–case basis and not by the application of a mechanical rule." *Proctor & Schwartz, Inc. v. Cleveland Lumber Company*, 228 Pa.Super. 12, 18, 323 A.2d 11, 15 (1974). The plaintiff has the burden of establishing that the Court has the power to exercise in personam jurisdiction over the defendant. *DiCesare–Engler Productions, Inc. v. Mainman Ltd.*, 81 F.R.D. 703, 705 (W.D.Pa.1979).

A discussion of two United States Supreme Court decisions—one holding that minimum contacts did exist and the other holding that sufficient contacts did not exist—will provide a framework within which we can evaluate the adequacy of the contacts that White had with Pennsylvania during the course of the aborted transaction. In *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), the Supreme Court en-

countered an attempt by a beneficiary to collect on a life insurance policy. Lowell Franklin, a resident of California, had purchased the policy from the Empire Mutual Insurance Company, which was an Arizona corporation without any agents or offices in California. A few years after Franklin purchased the policy, International Life Insurance Company assumed the insurance obligations of Empire Mutual. International Life, a Texas corporation with no offices or agents in California, mailed a reinsurance certificate to Franklin that offered to continue his insurance without any modification in terms. Franklin accepted the offer, and thereafter mailed the premiums to International Life's Texas office. Following Franklin's death in California, his beneficiary, a California resident, mailed the proofs of death to Texas. International Life refused to pay on the policy, asserting that Franklin had committed suicide. The beneficiary filed suit in California, serving International Life with process in Texas by registered mail pursuant to a California statute that specifically provided for service upon nonresident insurance companies in cases involving insurance policies that were held by residents. After obtaining a default judgment in the California action, the beneficiary filed suit on the judgment in Texas. The Texas courts refused to enforce the judgment, holding that the California court did not have personal jurisdiction over International Life.

The United States Supreme Court granted certiorari and reversed, ruling "that the Due Process Clause did not preclude the California court from entering a judgment binding on respondent." 355 U.S. at 223, 78 S.Ct. at 201. In its opinion, the Supreme Court addressed both functions of the minimum contacts requirement. First, it determined that the California judiciary did not infringe unduly on any other state's sovereignty by asserting jurisdiction over International Life because the defendant had solicited business in California and the lawsuit arose from that business. International Life had mailed the reinsurance certificate to California and had accompanied it with an offer to continue to carry Frank-

lin's insurance. Franklin accepted the offer in California and mailed his premiums to the defendant from California. Moreover, recognizing the important role that insurance plays in providing support for many people, the Supreme Court found that California had "a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims." *Id.*

The Supreme Court also determined that the California court did not impose an unreasonable burden on International Life when it required the insurer to defend the action in California. *Id.* at 224, 78 S.Ct. at 201. International Life voluntarily chose to generate revenue by insuring a California resident, so it should have expected that the insured or his beneficiary would file suit in California on any dispute involving the policy. Furthermore, the bulk of the potential witnesses undoubtedly resided in California, especially those who could provide testimony on International Life's defense of suicide. *Id.* at 223, 78 S.Ct. at 201.

Although the Supreme Court upheld the California court's exercise of in personam jurisdiction over International Life after finding that both functions of the minimum contacts requirement had been satisfied, it rejected an attempt by the Florida courts to adjudicate the rights of a Delaware trustee in *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1957). The latter case involved the disposition of the estate of Dora Browning Donner, who died in Florida in 1952. Following her death, Mrs. Donner's will was admitted to probate in Florida. The two residuary legatees initiated the litigation by filing suit in a Florida chancery court seeking a declaratory judgment that would identify the property that should pass under the will's residuary clause. Specifically, they alleged that a trust that Mrs. Donner had established was invalid, and therefore, that certain assets of the trust should pass to the residuary legatees.

The trust had its origin in 1935 when Mrs. Donner, then a resident of Pennsylvania, executed a trust instrument in Delaware.

The trust instrument named as trustee the Wilmington Trust Company of Wilmington, Delaware. In 1944, Mrs. Donner changed her residency to Florida. While living in Florida, she executed a will and the *inter vivos* power of appointment for the trust. She appointed the sum of $200,000 to each of two trusts, which had been established for the benefit of two of her grandchildren. The Delaware Trust Company served as trustee for both trusts, and the trusts' assets remained in Delaware.

In their Florida action, the residuary legatees contended that the original trust was invalid "because the settlor had reserved too much power over the trustee and trust corpus, and the power of appointment was not independently effective to pass the property because it was a testamentary act not accompanied by the requisite formalities." 357 U.S. at 243, 78 S.Ct. at 1234. Under settled Florida law, "a trustee is an indispensable party without whom a Florida court has no power to adjudicate controversies affecting the validity of a trust." *Id.* at 254–55, 78 S.Ct. at 1240. (footnote omitted). The legatees notified the trustee of their lawsuit by mailing to it a copy of the pleadings and a "Notice to Appear and Defend." The trustee did not appear or defend.

The Supreme Court of Florida held that Florida courts did have personal jurisdiction over the Delaware trustee and that the trust and the power of appointment were invalid. *Id.* at 242–43, 78 S.Ct. at 1233–1234. The United States Supreme Court reversed, ruling that the Florida courts could not constitutionally assert in personam jurisdiction over the trustee because the trustee did not have sufficient contacts with Florida.[1] The Court underscored the dual purpose of the "minimum contacts" requirement by beginning its analysis with the statement that no matter how "minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal con-

tacts' with that State that are a prerequisite to its exercise of power over him." *Id.* at 251, 78 S.Ct. at 1238. Sufficient contacts will not exist unless "the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* at 253, 78 S.Ct. at 1239.

After reviewing the undisputed facts of the case, the Supreme Court determined that the trustee had not purposefully availed itself of the privilege of conducting activities in Florida. The trust company had no office in Florida; it did not solicit any business in Florida; and it did not deposit any of the trusts' assets in Florida. The subject of the lawsuit—the trust instrument—was executed in Delaware by a resident of Pennsylvania. No term contained in the trust instrument required the trustee to undertake any action or conduct any business in Florida.

In their effort to support the Florida Supreme Court's decision that the Florida courts had personal jurisdiction over the trustee, the residuary legatees cited four contacts with Florida. First, Mrs. Donner moved her residence to Florida after creating the original trust. Second, Mrs. Donner executed the *inter vivos* power of appointment while residing in Florida. Third, she performed minor administrative tasks that involved the trust while residing in the forum state. Finally, the trustee mailed trust income to Mrs. Donner in Florida over a period of years.

The first three contacts that the legatees relied upon to establish in personam jurisdiction did not result from any action taken by the trustee; rather, Mrs. Donner's activities generated all three contacts. The United States Supreme Court ruled that such "unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." 357 U.S. at

---

1. Noting that all parties agreed that the trust assets were located in Delaware, the Court also held that "a State acquires no *in rem* jurisdiction to adjudicate the validity of *inter vivos*

dispositions simply because its decision might augment an estate passing under a will probated in its courts." 357 U.S. at 248, 78 S.Ct. at 1236.

253, 78 S.Ct. at 1239. Although the exercise of a power of appointment has a significant impact on the ultimate disposition of a trust, the legatees' lawsuit focussed on the validity of the structure of the original trust rather than on the propriety of choosing a specific person to select the beneficiaries of the trust assets. *Id.* The Court, in response to the legatees' reliance on *McGee v. International Life Insurance Co.*, emphasized that "[t]he cause of action in this case is not one that arises out of an act done or transaction consummated in the forum State." *Id.* at 251, 78 S.Ct. at 1238. In *McGee*, by contrast, the beneficiary's claim involved an insurance policy that the defendant had solicited in the forum state and that the deceased had accepted in the forum state.

The fourth contact that the legatees relied upon resulted from the trustee's practice of periodically mailing to Mrs. Donner in Florida the income generated by the trust assets. Although Mrs. Donner undoubtedly injected some of that income into the economy of Florida, and thus had an impact on Florida, the Supreme Court did not view the act of mailing the income to Florida as an act by which the defendant purposefully availed itself of the benefits and protection of the laws of the forum state. 357 U.S. at 252, 78 S.Ct. at 1239.

■ The quantity and quality of White's contacts with Pennsylvania lie between the sufficiency of the contacts in *McGee v. International Life Insurance Co.* and the inadequacy of the contacts in *Hanson v. Denckla*. Unlike *McGee*, the purchase order for the three loads of beef was not solicited in the forum state and was not issued in the

forum state. Moreover, the subject of the oral contract–the beef–never entered Pennsylvania, whereas the insured in *McGee* resided in the forum state. The Supreme Court has recognized that a state has a "manifest interest" in litigation involving the life insurance policies of its residents, but the Court has made no parallel finding in commercial contract cases.[2]

As in *Hanson*, the only contact that the nonresident defendant would have initiated with the forum state would have been the transfer of money into the forum state. The instant case features more contacts with the forum state than were present in *Hanson*, but these contacts only tangentially involve the defendant. White did not purposefully avail itself of the benefits and protection of the laws of Pennsylvania when it received a confirmation from Pennsylvania, when it received a telephone call from Pennsylvania, or when it agreed to purchase South American beef that a Pennsylvania corporation had made available.

*McGee v. International Life Insurance Co.* represents the broadest exercise of in personam jurisdiction that the United States Supreme Court has upheld. White's contacts with the forum state are substantially weaker than were International Life's contacts with California and are only slightly stronger than were the trustee's contacts with Florida in *Hanson v. Denckla*. Moreover, the majority of the probable witnesses in the present case reside in states other than Pennsylvania. Therefore, we hold that a court sitting within Pennsylvania cannot constitutionally assert in personam jurisdiction over White on the basis of

---

2. In *Lakeside Bridge & Steel Co. v. Mountain State Construction Co., Inc.*, 597 F.2d 596 (7th Cir. 1979), *cert. denied*, 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980), the Court of Appeals for the Seventh Circuit made a similar comparison of a state's relative interest in various types of litigation. The comparison arose in a case that involved an attempt by a Wisconsin manufacturer to obtain in personam jurisdiction over a West Virginia construction company in a Wisconsin court on a breach of contract claim. In the course of finding that a Wisconsin court could not constitutionally assert in personam jurisdiction over the defend-

ant, the Seventh Circuit determined that "[t]he forum state has a greater interest in protecting its citizens by providing a local forum in cases which involve effects 'of a sort highly dangerous to persons and things,' ... The forum state has a lesser interest in protecting a corporation in an interstate contract dispute, especially when the corporation left the state to solicit and secure the contract, because the effects of a commercial contract are unlikely to involve danger to persons or things within the state's borders." 597 F.2d at 602 n.11 (citation omitted).

White's contacts with Pennsylvania during the course of the aborted transaction.

Our conclusion does not conflict with the court decisions that the plaintiff has cited in support of its position. In *Proctor & Schwartz, Inc. v. Cleveland Lumber Co.*, 228 Pa.Super. 12, 323 A.2d 11 (1974), the Superior Court of Pennsylvania held that a court sitting within Pennsylvania could exercise in personam jurisdiction over Cleveland Lumber Company ("Cleveland"), a Georgia corporation, even though the corporation had no office, agents, or property in Pennsylvania and even though it had no business contacts with Pennsylvania except those that occurred during the transaction that gave rise to the litigation. Following extensive negotiations in Georgia and by telephone and mail, Cleveland had signed a contract in Georgia by which it agreed to purchase certain equipment from Proctor & Schwartz, Inc. ("Proctor"), a Pennsylvania corporation. Proctor, which was to manufacture and assemble the equipment, accepted and executed the contract in Philadelphia, Pennsylvania. Under the express terms of the contract, Pennsylvania law would govern the construction and interpretation of the agreement.

The Superior Court stated that several factors contributed to its conclusion that a Pennsylvania court would not violate Cleveland's right to due process if it exercised in personam jurisdiction over the nonresident defendant. First, Cleveland should reasonably have anticipated that the contract would have a substantial economic impact within the Commonwealth. 228 Pa.Super. at 22, 323 A.2d at 17. Second, the defendant "should reasonably have anticipated that a failure to make the . . . payments on its obligation . . . could result in its being called to defend itself in the state whose laws governed the contract." *Id.* at 21, 323

A.2d at 16. Third, Cleveland "was not a passive purchaser which blandly submitted to the mandates of a foreign seller. Rather, Cleveland conducted extensive and active negotiations with Proctor. . . ." *Id.* Fourth, the defendant often entered into commercial contracts with companies in states other than Georgia. *Id.* Finally, the necessity of litigating in Pennsylvania would not impose an unreasonable financial burden on Cleveland. *Id.*

Two of the factors that the Superior Court relied upon to reach its holding also appear in the present case. Although White operates stores only in Tennessee, it regularly enters into commercial contracts with nonresident companies. Furthermore, White has the financial resources to conduct the defense of a lawsuit in the Western District of Pennsylvania. Neither of these factors, however, involves contact between White and Pennsylvania. The three factors that did tie Cleveland to Pennsylvania do not have parallel contacts in the present case. First, the Cleveland–Proctor contract had a substantial impact on the Commonwealth because Proctor manufactured and assembled the equipment in Pennsylvania. By contrast, the beef that Galaxy attempted to sell to White never entered Pennsylvania. If White had accepted the beef, Galaxy would have passed on the bulk of the contract price to the South American producer and to nonresident transportation companies.[3]

Second, a term in the contract that Cleveland signed provided that Pennsylvania law would govern the construction and interpretation of the agreement. During the discussion that led to White's decision to buy the three loads of beef, neither Edward Simpson of White nor Guy Roberts of Morris Brokerage raised the choice of law issue.

---

**3.** The lack of a connection between the subject of the contract and Pennsylvania also distinguishes the present case from *Inpaco, Inc. v. McDonald's Corp.*, 413 F.Supp. 415 (E.D.Pa. 1976). The *Inpaco* court found that the defendant, a Delaware corporation which had its principal place of business in Illinois, did have sufficient contacts with Pennsylvania to support in personam jurisdiction because the underlying contract–involving the design of a machine–was to have been performed almost entirely in Pennsylvania, representatives of the defendant had visited the plaintiff's office in Pennsylvania twice, and the contract had resulted from active negotiations. None of these three factors has a counterpart in the present case.

Although the confirmation that Galaxy mailed to White contained a choice of law term, White did not sign or return that confirmation. A written confirmation operates as an acceptance of a contract even though it states additional terms. 12A Pa. Stat.Ann. § 2–207(1) (1970) (current version at 13 Pa.Cons.Stat.Ann. § 2207(a) (West Pamphlet 1980)). "The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless: . . . (b) they materially alter it; . . ." 12A Pa.Stat.Ann. § 2–207(2) (1970) (current version at 13 Pa.Cons.Stat.Ann. § 2207(b) (West Pamphlet 1980)). We view the addition of a choice of law term to this contract as a significant alteration, and therefore, we rule that it did not become part of the contract. Without a binding choice of law term in the contract, Tennessee law probably would govern the litigation because Galaxy, through Morris Brokerage, informed White in Tennessee about the availability of the beef, White's agent agreed in Tennessee to purchase the beef, and the beef was delivered to White's place of business in Tennessee. *See Restatement (Second) of Conflict of Laws* § 188 (1971).

Finally, unlike Cleveland, White did not conduct extensive negotiations with Galaxy before agreeing to purchase the beef. In fact, White did not communicate directly with Galaxy until after it had rejected the beef. The only discussion that preceded White's decision to purchase the beef occurred in Tennessee between Edward Simpson and an employee of Morris Brokerage.

Thus, all three critical contacts that linked the Georgia corporation to Pennsylvania in *Proctor & Schwartz, Inc. v. Cleveland Lumber Co.* are absent from the present case. As the Supreme Court stated in *Hanson v. Denckla,* no matter how "minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had . . . 'minimal contacts' with that State." 357 U.S. at 251, 78 S.Ct. at 1238.

The plaintiff also relies heavily on *Controlled Metals, Inc. v. Non–Ferrous International Corp.,* 410 F.Supp. 339 (E.D.Pa.1976), to support its contention that this Court has in personam jurisdiction over White. Non–Ferrous International Corporation ("Non–Ferrous"), a New York corporation with its principal place of business in New York, telephoned Controlled Metals, Inc. ("Metals"), a Pennsylvania corporation with its principal place of business in Pennsylvania, to request price information on condenser tubing. After receiving this information the next day, Non–Ferrous placed an order with Metals over the telephone. Metals subsequently arranged with a supplier for the tubing. In order to facilitate the seller's shipment of the tubing, Non–Ferrous mailed to Metals a package containing bills of lading, packing lists and packing slips that bore the buyer's letterhead. Non–Ferrous then made several telephone calls to Metals. Through the first of these calls, Non–Ferrous learned that the tubing had been cut to its specifications and was ready for shipment. The following day, Non–Ferrous telephoned Metals to ask that the seller lower its price because the buyer's customer had cancelled its order. Metals later gave Non–Ferrous a revised price, but Non–Ferrous attempted to negotiate an even lower price. These negotiations did not bear fruit for Non–Ferrous, however, and it subsequently returned the original invoice to Metals without any payment.

Metals filed suit in a Pennsylvania state court against Non–Ferrous for an alleged breach of the oral contract. Non–Ferrous, after removing the case to federal district court, moved for dismissal on the basis of an alleged lack of in personam jurisdiction. Although the district court assumed for the purpose of deciding the motion to dismiss that Non–Ferrous had no bank accounts, mailing address, telephone listing, business facility, or employees in Pennsylvania and had neither executed any contracts nor made any sales in Pennsylvania, it ruled that a court sitting within Pennsylvania could legitimately assert in personam jurisdiction over the defendant in an action that arose from the defendant's contacts with Pennsylvania. 410 F.Supp. at 341, 342.

Six factors contributed to the court's decision that Non–Ferrous had sufficient contacts with Pennsylvania. First, Non–Ferrous had initiated the contacts with the Pennsylvania corporation that led to the formation of the alleged oral contract. Second, in response to Non–Ferrous' order, Metals arranged to obtain pipe from a Pennsylvania supplier. Third, Non–Ferrous mailed materials to Metals for use in shipping the pipe from Pennsylvania to New York. Fourth, "[s]ince acceptance of defendant's offer to buy was made by plaintiff's agent in Pennsylvania and, since performance was to take place within Pennsylvania, the agreement must be considered a Pennsylvania contract." 410 F.Supp. at 343. Fifth, Non–Ferrous was not a passive purchaser, but rather, it initiated the business relationship and it negotiated with the seller for a reduction in the price. Finally, the claim arose "directly from the contacts between the plaintiff and defendant." *Id.*

None of these six factors has a counterpart in the case now before us. Galaxy, the resident corporation, initiated the aborted transaction by notifying Morris Brokerage of the availability of the three loads of beef. Morris Brokerage then contacted White in Tennessee. No activity occurred in Pennsylvania as a result of White's purchase order. The beef originated in South America and never entered Pennsylvania. White did not mail any materials to Pennsylvania and it did not return Galaxy's confirmation. As we already have discussed, the contract probably would be interpreted in accordance with the law of Tennessee. White was a passive purchaser; it did not attempt to conduct any negotiations before entering into the contract. In fact, White and Galaxy did not communicate directly with each other until after White agreed to purchase the beef.[4]

The nonresident defendants in *Proctor & Schwartz, Inc. v. Cleveland Lumber Co.* and *Controlled Metals, Inc. v. Non–Ferrous International Corp.* had significantly greater contacts with Pennsylvania, both quantitatively and qualitatively, than White has with Pennsylvania. Neither of these decisions supports a finding that a court sitting within Pennsylvania can exercise in personam jurisdiction over White solely on the basis of White's contacts with the forum that arose during the course of the uncompleted transaction.

Although not discussed by the plaintiff, the case of *M & N Meat Company v. American Boneless Beef Corp.*, 380 F.Supp. 912 (W.D.Pa.1974), is more analogous to the present case than are *Proctor & Schwartz, Inc. v. Cleveland Lumber Co.* and *Controlled Metals, Inc. v. Non–Ferrous International Corp.* In *M & N Meat Company v. American Boneless Beef Corp.*, the late Judge Daniel Snyder of this Court ruled that a Pennsylvania purchaser of beef could obtain in personam jurisdiction over a Massachusetts seller in a court sitting within Pennsylvania. Like Galaxy, American Boneless Beef Corporation ("Boneless") had three loads of beef available for sale. Hess–Stephenson Company ("H–S"), an independent meat broker located in Chicago, received authorization from Boneless to obtain a buyer for this beef, which was being stored in New York. The broker telephoned M & N Meat Company ("M & N") in Pittsburgh, Pennsylvania to solicit an order,

---

**4.** Five of the six factors that distinguish *Controlled Metals, Inc. v. Non–Ferrous International Corp.* from the present case also distinguish *Empire Abrasive Equipment Corp. v. H. H. Watson, Inc.*, 567 F.2d 554 (3d Cir. 1977), from the present case. In *Empire Abrasive Equipment*, the Third Circuit reversed a district court's ruling that a court sitting within Pennsylvania could not exercise in personam jurisdiction over H. H. Watson, Inc. ("Watson"), a Rhode Island corporation; it remanded the case to permit discovery on the issue of personal jurisdiction. Watson had initiated its contacts with Pennsylvania by placing an order over the telephone with a Pennsylvania corporation for eleven abrasive finishing cabinets that had been described in a mail–order catalog. Empire Abrasive Equipment Corp. ("Empire") notified its supplier of the order. At Empire's request, Watson caused a Rhode Island bank to issue a letter of credit to the seller. Pennsylvania law would govern the contract because the seller accepted Watson's offer in Pennsylvania and performance was to occur in Pennsylvania. Empire's lawsuit for breach of contract, which was filed after Watson cancelled its order for the cabinets, arose directly from Watson's contacts with Pennsylvania.

and M & N agreed to purchase all three loads for delivery to various retailers in several states. H–S then mailed a written confirmation of the order to M & N. Upon M & N's request, Boneless shipped the first load from New York to retailers that M & N designated in Tennessee and Indiana. This shipment travelled through Pennsylvania. Boneless subsequently invoiced M & N for the first load, and M & N mailed a check in the amount of $19,080 from Pennsylvania to Massachusetts. Although M & N later asked Boneless to ship the remaining two loads, Boneless failed to deliver them.

After covering the resulting deficiency by purchases in the market, M & N sued Boneless in the Western District of Pennsylvania on a breach of contract claim. Boneless moved to dismiss for lack of in personam jurisdiction. Judge Snyder denied the defendant's motion, ruling that a court sitting within Pennsylvania could assert in personam jurisdiction over Boneless without violating its right to due process.

Although many similarities exist between *M & N Meat Company v. American Boneless Beef Corp.* and the present case, two factors that were central to Judge Snyder's decision distinguish the cases and justify a different result. First, Boneless, acting through H–S, solicited a purchase order from a Pennsylvania corporation that had its principal place of business in Pittsburgh, Pennsylvania. Boneless did not have to solicit business in Pennsylvania. It had its own regular commercial outlet for beef, but it chose to seek additional profit by diverting some of its meat to other markets. 380

F.Supp. at 916–17. Judge Snyder determined that the state in which the seller solicited business did have a sufficient interest in the transaction to serve as a forum for the resulting litigation. This determination does not apply to the present case, however, because White did not solicit any business in Pennsylvania. Rather, Galaxy, acting through Morris Brokerage, left Pennsylvania to solicit business in Tennessee.

The presence in Pennsylvania of the load of beef that Boneless did ship also influenced Judge Snyder's decision. *Id.* at 917. Under the Pennsylvania long–arm statute, 42 Pa.Cons.Stat.Ann. § 5322(a)(1)(iii) (West Pamphlet 1980), the shipping of merchandise through the Commonwealth constitutes a sufficient business connection to empower the courts of the Commonwealth to exercise in personam jurisdiction over the nonresident defendant in a case related to the shipment.[5] In the present case, the three loads of beef never entered Pennsylvania.

The set of facts that confronted Judge Snyder paralleled the set of facts that confronted the Supreme Court in *McGee v. International Life Insurance Co.* Both defendants had solicited one business transaction in the forum states; these transactions had given rise to the litigation; the subject matter of the contracts had a presence in the forum states; and the defendants received checks that had been prepared in the forum states. These contacts do not have counterparts in the present case.

None of the cases that we have reviewed supports Galaxy's position.[6] We therefore

---

5. In some instances, it may be fundamentally unfair to require a defendant to litigate in Pennsylvania when its only connection with the Commonwealth was that some of its goods travelled through the Commonwealth on their way to another state. In *M & N Meat Company v. American Boneless Beef Corp.*, however, Boneless had solicited a purchase order in Pennsylvania for the beef that subsequently travelled through the Commonwealth. Thus, Boneless definitely had contacts with Pennsylvania that would justify a court sitting within Pennsylvania to require the defendant to litigate the breach of contract claim in the Commonwealth.

6. In addition to finding that the holdings of the cases that we have discussed do not support the exercise of in personam jurisdiction over White, we note that recent appellate decisions have strongly reaffirmed the limitations on the exercise by states of personal jurisdiction over nonresident defendants. In all four of its latest forays into the field of personal jurisdiction, the United States Supreme Court held that the states involved could not constitutionally assert personal jurisdiction over the defendants. *See Rush v. Savchuk*, 444 U.S. 320, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980) (quasi in rem); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (in

hold that Galaxy has not carried its burden of establishing that a court sitting within Pennsylvania can constitutionally exercise in personam jurisdiction over White solely on the basis of White's contacts with the Commonwealth that involve the uncompleted transaction of December, 1979.

*Aggregate of Contacts*

■ Having concluded that the aborted transaction alone did not generate the quantity and quality of contacts between White and Pennsylvania that would make it reasonable for a court to require White to travel to Pennsylvania to defend an action resulting from that transaction, we now must consider the plaintiff's second proposed ground for jurisdiction. Galaxy contends in the alternative that a court sitting within Pennsylvania can constitutionally exercise in personam jurisdiction over White based upon the aggregate of White's connections with the Commonwealth, all of which resulted from White's business relationship with Galaxy.

Courts do recognize that a nonresident defendant's continuous and substantial business relationship with residents of a state provides sufficient contacts to enable the courts of that state to exercise in personam jurisdiction over the defendant, even in cases that involve claims that do not arise from the defendant's contacts with the state. In *Bork v. Mills*, 458 Pa. 228, 329 A.2d 247 (1974), for example, the Pennsylvania Supreme Court stated that a Pennsylvania resident could sue a Maryland resident in a Pennsylvania court on a claim arising from a traffic accident that had occurred in Virginia if the plaintiff could allege facts that would establish that the Maryland resident's freight hauling activities in Pennsylvania are "continuous and substantial." *Id.* at 231, 329 A.2d at 249. *See Shen Manufacturing Company, Inc. v. Gen-Tex Printing Company, Inc.*, 465 F.Supp. 829, 830–31 (E.D.Pa.1978); *Damon Coats, Inc. v. Munsingwear, Inc.*, 431 F.Supp. 1303, 1308 (E.D.Pa.1977). The holding in *Bork v. Mills* and in other similar cases flows from the determination that a state has an interest in a corporation that does a substantial amount of business within its borders and that a corporation does not incur an unreasonable burden when called upon to litigate in a state in which the corporation regularly conducts business.

■ Although we have the power to assert in personam jurisdiction over a corporation that has substantial and continuous business activities in Pennsylvania, the nebulous nature of the test prevents it from providing us with much guidance when we must examine the issue of personal jurisdiction in a particular case. The essence of the test remains whether or not it is fundamentally unfair to require the nonresident corporation to travel to Pennsylvania to defend the lawsuit. We have as a point of reference, however, an opinion issued by this Court in *DiCesare–Engler Productions, Inc. v. Mainman Ltd.*, 81 F.R.D. 703 (W.D. Pa.1979), in which we held that David Bowie, a rock music star who has performed several concerts in Pennsylvania, did not have a sufficient nexus with Pennsylvania to permit us to hear a Pennsylvania rock promoter's claim that Bowie had breached a contract to perform a concert in Cincinnati, Ohio. We concluded that the presentation of sporadic concerts in Pennsylvania, as components in various national concert

personam); *Kulko v. California Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978) (in personam); *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (quasi in rem). At the circuit court level, the Court of Appeals for the Seventh Circuit issued an opinion last year that took a very restrictive view of a state's power to compel a nonresident corporation to litigate in a distant forum. *Lakeside Bridge & Steel Co. v. Mountain State Construction Co., Inc.*, 597 F.2d 596 (7th Cir. 1979), *cert. denied*, 445 U.S. 907, 100 S.Ct. 1087, 63 L.Ed.2d 325 (1980). In a case in which

a Wisconsin seller had solicited an order at a West Virginia buyer's office, the Seventh Circuit held that the due process clause of the fourteenth amendment would not permit a Wisconsin court to exercise in personam jurisdiction over the West Virginia construction company in a breach of contract action even though the plaintiff had manufactured the materials that were covered by the contract in Wisconsin and even though the West Virginia buyer had placed several telephone calls and had mailed several items to Wisconsin during the course of the business relationship.

tours that Bowie conducted, could not constitute a continuous and substantial business relationship with Pennsylvania. *Id.* at 706–07.

The present case is closely analogous to the case involving David Bowie. During the course of a year, White must make hundreds of purchases from sellers throughout the United States to supply its forty-three supermarkets. In 1979, White placed three purchase orders with Galaxy. These orders represented only a small percentage of White's total purchases, just as Bowie's Pennsylvania concerts represented only a small component of his national concert tours. Moreover, each of the three purchase orders was an unrelated event. Although Galaxy alleges that it had an established business relationship with White, the facts of the case do not support such a conclusion. During 1978 and the first half of 1979, Galaxy placed approximately ten telephone calls to White's meat buyer for the purpose of soliciting purchase orders. White did not accept any of these offers. During the second half of 1979, Galaxy had more success with White. Nevertheless, the three purchase orders that White submitted did not reflect a decision by White to buy beef from Galaxy on a regular basis; each purchase order resulted from an independent decision to accept the terms of the particular offer. Finally, Galaxy does not allege that White ever did business with any Pennsylvania company other than Galaxy. Therefore, we must decide whether three unrelated purchase orders establish that White had continuous and substantial business contacts with residents of Pennsylvania. We hold that these sporadic contacts do not provide a sufficient foundation upon which to base the exercise of in personam jurisdiction over White because Pennsylvania does not have a legitimate interest in White.

### Conclusion

Although proper venue does lie in the Western District of Pennsylvania for Galaxy's breach of contract action against White, this Court cannot exercise in personam jurisdiction over White either on the basis of White's contacts with the Commonwealth that involve the uncompleted transaction or on the basis of White's aggregate business contacts with a resident of the Commonwealth. Galaxy, alleging that it does not have adequate resources to prosecute a lawsuit in Tennessee, urges us not to dismiss the present action. One would think that a corporation with the name of Galaxy International would be prepared to litigate anywhere in the universe, or at least anywhere in this solar system. We do recognize, however, that the dismissal of this action will cause the plaintiff some inconvenience if it wishes to pursue its claim in Tennessee. Nevertheless, we do not believe that a court sitting within Pennsylvania can require White to litigate in this Commonwealth without violating the due process clause of the fourteenth amendment. Galaxy chose to solicit a purchase order in Tennessee; it should have anticipated the need to litigate in Tennessee if a claim arose from that purchase order.