DiCESARE–ENGLER PRODUCTIONS,
INC., a corporation, Plaintiff,

v.

MAINMAN LTD., a corporation, and
David Bowie, an Individual,
Defendants.

Civ. A. No. 76–292.

United States District Court,
W. D. Pennsylvania.

March 1, 1979.

David Abrams, Monroeville, Pa., for plaintiff.

Stanley M. Stein, Feldstein, Grinberg, Stein and McKee, Pittsburgh, Pa., for defendants.

OPINION

COHILL, District Judge.

Plaintiff, DiCesare-Engler Productions, Inc. ("D–E"), brought an action in four counts in the Court of Common Pleas of Allegheny County, Pennsylvania ("state court") against defendants Mainman Ltd. ("Mainman") and David Bowie ("Bowie") for damages allegedly resulting from Mainman's cancellation of a concert that Bowie was to have performed at the Cincinnati Gardens, Cincinnati, Ohio on June 25, 1974. The suit was removed to this court, and, on Bowie's motion, this court struck a default judgment it had entered against Bowie. *See DiCesare-Engler Productions Inc. v. Mainman Ltd.*, 421 F.Supp. 116 (W.D.Pa. 1976) (detailing procedural history). D–E again attempted to serve Bowie with process and took a second default judgment after Bowie again had failed to file an appearance in the case.

Bowie has moved to strike the second default judgment, asserting improper service of process and a lack of personal jurisdiction. Mainman has moved to dismiss the complaint for lack of personal jurisdiction and, as to Counts II and IV, for failure to state a claim upon which relief can be granted. We consider the motions separately.

I.

*Bowie's Motion to Strike Default Judgment*

Fed.R.Civ.P. 55(c) provides that a judgment by default may be set aside in accordance with Fed.R.Civ.P. 60(b). Rule 60(b)(4) specifies in pertinent part:

> "On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment [if] . . . (4) the judgment is void."

 A judgment is void not if it is merely erroneous, but if the court rendering it lacked jurisdiction over the parties or the subject matter or denied a party due process. 11 C. Wright & A. Miller, Federal Practice and Procedure § 2862 (1973). We must consider, therefore, whether D–E

served Bowie in accordance with the so-called Pennsylvania Long-Arm Statute, 42 Pa.C.S.A. § 8301 et seq.[1], as authorized by Fed.R.Civ.P. 4(d)(7), and whether this court can exercise personal jurisdiction over Bowie pursuant to that statute.

## A. Service of Process

42 Pa.C.S.A. § 8307 requires process to be mailed to the Department of State and to the defendant addressed to him "at his last known address." On September 6, 1977, D–E directed service to be mailed to Bowie in "Ocho Rios" [sic] Jamaica, which was an address at which Bowie resided for some time and which he designated as his permanent address on a non-resident alien income tax return Bowie filed in Ocharias, Jamaica on January 15, 1976. However, during the deposition of Attorney Stanley Diamond, held on July 6, 1976 in Los Angeles, California, in which counsel for D–E participated via a telephone hook-up, Mr. Diamond, who was Bowie's attorney in other matters, had advised counsel for D–E that, as of about May, 1976, Bowie intended to "make his permanent home" in Blonay, Switzerland. Mr. Diamond also had stated that he had, at his home, Bowie's address in Blonay. Counsel for D–E did not, however, ask Mr. Diamond to provide him with the address.

■ Under these circumstances, we conclude that D–E did not address process to Bowie "at his last known address." When put on notice that Bowie had moved to Blonay, Switzerland, D–E was required to make at least a minimal effort to obtain his new address. Had counsel for D–E as much as asked Mr. Diamond to provide him with the current address, we might have a different view of this matter. The fact that Bowie failed to appear at his deposition scheduled after process was mailed, judgment was entered, and the motion to strike the judgment was filed, is not relevant to D–E's efforts to obtain Bowie's last known address before attempting to serve him. Although we are inclined to allow, where necessary, the taking of the deposition of a party asserting improper service of process, plainly D–E has made an insufficient showing that it addressed process to Bowie's last known address to warrant a deposition for that purpose. *See, e. g., River Plate Corp. v. Forestal Land, Timber & Ry. Co.*, 185 F.Supp. 832 (S.D.N.Y.1960); *H. L. Moore Drug Exchange, Inc. v. Smith, Kline & French Lab.*, 384 F.2d 97 (2d Cir. 1967) (per curiam); 4A Moore's Federal Practice ¶ 30.53[5] (2d ed. 1978). We find, therefore, that service of process has not been made on Bowie in compliance with 42 Pa.C.S.A. § 8307.

## B. Personal Jurisdiction Over Bowie

Because this case was commenced in state court on October 28, 1975 and removed to this court on March 8, 1976, yet service has still not been made properly on Bowie, we will now consider Bowie's contentions in his motion that this court cannot exercise personal jurisdiction over him.

■ When a defendant appropriately challenges the existence of personal jurisdiction over him, the plaintiff has the burden of proving by a preponderance of the evidence that the court can exercise jurisdiction over the defendant. *Amba Marketing Systems, Inc. v. Jobar Intern., Inc.*, 551 F.2d 784, 787 (9th Cir. 1977); *Marshall Exports, Inc. v. Phillips*, 507 F.2d 47, 49 (4th Cir. 1974); 5 C. Wright & A. Miller, Federal Rules of Civil Procedure: Civil § 1351 (1969). Rather than resting on the bare allegations of the complaint, the plaintiff is obligated to come forward with facts, by affidavit or otherwise, in support of personal jurisdiction. *Amba Marketing Systems, Inc. v. Jobar Intern., Inc., supra;* Wright & Miller, *supra.*

Here, in response to an order of court dated September 19, 1978 in connection

---

1. The Pennsylvania Long-Arm Statute was superseded by the Uniform Interstate and International Procedure Act, 42 Pa.C.S.A. § 5321 et seq. (1975 Pamphlet-Part 1), effective June 27, 1978. Since the changes in the courts' jurisdiction made by the successor act do not affect matters pending on its effective date, *see* § 8 of Act 1976, July 9, P.L. 586, No. 142, we deal only with the Long-Arm Statute and cases relating to it.

with Mainman's motion to dismiss, D–E filed affidavits detailing the events underlying its claim. According to the affidavits, Richard A. Engler, who is an officer of D–E, received a phone call from Jim Ramos, who is a representative of Creative Management Associates, Inc. ("CMA") inquiring whether D–E would be interested in promoting a Bowie concert in the Cincinnati Gardens on June 25, 1974. Ramos explained that one Ross Todd had arranged for the Gardens on that date but was required to withdraw from that commitment. If representatives for the Gardens would agree to substitute D–E on the lease for that date, Ramos explained, then D–E could promote the Bowie concert. After discussing the matter with Patrick J. DiCesare, another officer of D–E, who concurred with Engler that D–E should promote the concert, Ramos called Engler back, telling him that the Gardens agreed to the substitution and "the gig is yours." Ramos initiated a telephone connection between Engler and Todd to make further arrangements for the concert.

Shortly thereafter, a representative of Mainman called DiCesare to discuss the terms of "the writing which confirmed the agreement between Mainman Ltd. and [D–E] to present the David Bowie concert." DiCesare advised the representative that D–E had not yet received this writing. After a discussion about cost figures for the concert, the representative told DiCesare to send $9,595.45 as an "advance 'guarantee' for the performance of . . . Bowie," which D–E did. This representative and another Mainman representative both told DiCesare to increase the cost figures in the confirming writing if they were too low.

D–E later received the proposed written agreement that was to confirm the arrangement, inked in new cost figures, and signed and returned it to CMA for Mainman's signature. An agent of Mainman called a few days later notifying D–E that CMA had not received the writing, so D–E sent a photostat of the copy it had retained. In the next two weeks, D–E received numerous phone calls from representatives of Mainman and Bowie inquiring about the progress of advance ticket sales.

The first indication of any dispute that D–E had was about five days before the concert when the Gardens called D–E to inquire why the concert was cancelled. D–E called CMA, which confirmed the cancellation, stating that Bowie would not perform before what they estimated would be less than a capacity audience. CMA refused either to furnish Bowie's services or to return the guarantee "due to [D–E's] breaches of the agreement between [D–E] and [Mainman]" for the Bowie Concert at the Gardens.

In general, D–E asserts that Bowie "has performed on many instances concerts in Pennsylvania and as such, conducts business in the Commonwealth of Pennsylvania." DiCesare affidavit filed December 8, 1978.

Affidavits by Norman Weiss, who is in charge of CMA's concert department, and Jim Ramos in large part substantiate D–E's version of defendants' activities in these negotiations, although they differ in important respects relating to the merits of the dispute. According to the CMA affidavits, CMA's client was Mainman, not Bowie, in the dealings with D–E. As it customarily does, CMA, acting on behalf of Mainman, the "producer" who would guarantee Bowie's appearance and performance, negotiated with D–E, the promoter who wished to sponsor the concert. When negotiations progressed to a satisfactory point, Ramos sent D–E a proposed contract to sign as a "firm offer" and to return to CMA for Mainman's acceptance. Since D–E "unilaterally" had increased the cost breakdown in the proposed contract, Mainman chose not to accept the "new proposal and terminated dealings with Messrs. Engler and DiCesare." The proposed written agreement included the following clause: "The validity, construction and effect of this contract shall be governed by the laws of the State of New York regardless of place of performance."

D–E has not met its burden of proof that this court can exercise jurisdiction over Bowie in this case. Clearly, Bowie has com-

mitted no tort in Pennsylvania within the meaning of 42 Pa.C.S.A. § 8303. *See, e. g., Stifel v. Lindhorst,* 393 F.Supp. 1085 (M.D. Pa.), *aff'd,* 529 F.2d 512 (3d Cir. 1975), *cert. denied,* 425 U.S. 962, 96 S.Ct. 1746, 48 L.Ed.2d 207 (1976).

As for § 8304, we think that any cause of action D–E has against Bowie did not arise from Bowie's "doing business" in Pennsylvania. D–E has not shown that Bowie did any act or engaged in any business or profession within Pennsylvania under § 8309(a). Contrary to the conclusory allegations in the Complaint, the parties' affidavits clearly establish that all dealings were between D–E and CMA as Mainman's agent or Mainman itself.

█ Moreover, where the cause of action did not arise from an individual's doing business in Pennsylvania, any other business Bowie has done in the state must be "so continuous and substantial as to make it reasonable" for the trial court to exercise jurisdiction over him with respect to an unrelated cause of action. *Bork v. Mills,* 458 Pa. 228, 232, 329 A.2d 247, 249 (1974); *Miller v. American Telephone & Telegraph Co.,* 394 F.Supp. 58, 61 (E.D.Pa.1975), *aff'd,* 530 F.2d 964 (3d Cir. 1976). We conclude that D–E's assertion that Bowie "has performed on many instances concerts in Pennsylvania" is not a sufficient showing of business "so continuous and substantial" to confer long-arm jurisdiction for the unrelated cause of action in this case.

§ 8305, relating to an act outside Pennsylvania causing harm within the state, is likewise unavailing to D–E. The Third Circuit has ruled that the failure to act is not an "act" within the meaning of § 8305. *Witt v. Scully,* 539 F.2d 950, 952–53 (3d Cir. 1976). *See also Moffitt v. Wallace,* 430 F.Supp. 1133 (E.D.Pa.1977). Although the complaint stresses communicating the cancellation to the Gardens and the act of cancelling as the wrongful acts, the essence of the alleged wrong is that Bowie *failed* to perform a concert, which in our view is "mere nonfeasance" not encompassed by § 8305. *Moffitt v. Wallace, supra,* at 1135. Advance notification to the Gardens could

only mitigate D–E's damages, not "cause harm"; it was the *failure* to appear, not the communication of it, that caused any harm to D–E, in our view. Thus, § 8305 does not confer personal jurisdiction over Bowie either.

█ Because service of process was not made properly on Bowie, and because this court can not exercise jurisdiction over him under the Long-Arm Statute, we will strike the default judgment. Since Bowie has raised the personal jurisdiction issue and D–E has had ample notice and opportunity to meet it, we will treat D–E's motion as including a request for dismissal of the complaint as to him, and we will grant that request.

## II.

### *Mainman's Motion to Dismiss*

Mainman's motion to dismiss asserts a lack of personal jurisdiction and a failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b). We consider these contentions separately.

### A. *Lack of Personal Jurisdiction*

█ Jurisdiction over a corporation, in contrast to an individual, can be exercised "to the fullest extent allowed under the Constitution of the United States." 42 Pa. C.S.A. § 8309(b). In making this determination federal courts are not bound by state judicial precedent. *Empire Abrasive Equipment v. H. H. Watson, Inc.,* 567 F.2d 554, 556 n. 1 (3d Cir. 1977).

In *Empire Abrasive* the Third Circuit observed that "a rather low threshold of state interest is sufficient to justify exercise of the state's sovereign decisional authority . . . ." Quoting from Judge Gibbons' concurring opinion in *Jonnet v. Dollar Sav. Bank of City of New York,* 530 F.2d 1123, 1140 (3d Cir. 1976), the Court of Appeals explained this threshold:

"*International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, posited twin limitations upon the scope of state judicial power. *First,* out of respect

for values of federalism, the due process clause was held to forbid a state to exercise its adjudicatory authority in a manner that would encroach upon the sovereignty of a sister state. A state must have some palpable interest—rationally connected with public policy—in adjudicating a dispute within its borders for jurisdiction to be lawfully acquired. . .

The *second* jurisdictional limitation interposed by the due process clause focuses upon the parties and the burdens associated with litigating in a particular forum. This limitation upon judicial power prevents a state of a plaintiff's choosing from coercing defense of a suit in a forum which, because of its remoteness from defendant's residence and from witnesses and proof, would be fundamentally unfair. This limitation is bound up in notions of fair play and substantial justice, and not at all in sovereignty."

In the case before us, subjecting Mainman to Pennsylvania's jurisdiction would not transgress the first due process limitation. Although New York (and possibly Ohio) has an interest in the resolution of this dispute, certainly Pennsylvania has not an insubstantial sovereign interest as well. The plaintiff beneficiary, D–E, is a Pennsylvania corporation located in Pennsylvania, which allegedly was obligated to Mainman to produce the Bowie concert and which foreseeably was required to enter into a lease arrangement for the Gardens.

As for the second due process limitation, the court in *Empire Abrasive* instructed: "Absent disparity in bargaining power, in a dispute growing out of a commercial undertaking, that issue can best be decided, we think, by reference to the expectation of the parties to the transaction." 567 F.2d at 558. In that case, the appellate court concluded that Pennsylvania courts lacked jurisdiction over a Rhode Island bank that had issued an irrevocable letter of credit to be used in Rhode Island, where any cause of action against the bank arose in Rhode Island, and the bank had done nothing in Pennsylvania and had had no contact with

the Pennsylvania plaintiff. *Id.* The court of appeals, however, did intimate that Pennsylvania could exercise jurisdiction over a Rhode Island corporation that had initiated dealings with the Pennsylvania plaintiff for the sale of specialized, non-typical mail-order merchandise, for which the Pennsylvania seller had to subcontract, where the parties may have had prior dealings. *Id.* at 559. *See generally* 2 Moore's Federal Practice ¶ 4.41–1[1] (2d ed. 1978).

Perhaps the farthest the Supreme Court has extended the *International Shoe* doctrine was in *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). There, suit was brought in California against a non-resident insurance corporation. The policy on which the action was based had been purchased from an Arizona corporation. After the defendant, a Texas corporation, had assumed the assets of the Arizona company, it mailed a reinsurance certificate to the decedent, offering to insure him under the terms of the original policy. The decedent agreed and mailed his premiums to the company in Texas. This was the defendant's sole contact with California. In ruling on the propriety of a judgment the California Court entered against the defendant, a unanimous Supreme Court said:

"Turning to this case we think it apparent that the Due Process Clause did not preclude the California court from entering a judgment binding on respondent. It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State. *Cf. Hess v. Pawloski* [274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091;] . . . *Henry L. Doherty & Co. v. Goodman* [294 U.S. 623, 55 S.Ct. 553, 79 L.Ed. 1097;] . . . *Pennoyer v. Neff* [95 U.S. 714, 24 L.Ed. 565]. . . . The contract was delivered in California, the premiums were mailed from there and the insured was a resident of that state when he died. It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims. These residents would be a

severe disadvantage if they were forced to follow the insurance company to a distant State in order to hold it legally accountable."

335 U.S. at 223, 78 S.Ct. at 201. (citations omitted.) Thus, under *McGee*, even a single contact with a state may be sufficient to base jurisdiction in a suit arising from that contact.

As for present case, we have already described most of Mainman's contacts, through its agent, CMA, with Pennsylvania. In addition, D–E has asserted that Mainman "negotiates contracts for the performing arts in the Commonwealth of Pennsylvania." DiCesare affidavit filed December 8, 1978.

■ Under the facts of this case, it is fair to require Mainman to defend this suit in Pennsylvania. We recognize that the question of whether or not D–E orally accepted an oral offer by CMA, Mainman's agent, has not been determined; however, that issue goes directly to the ultimate merits of the case. In any event, however, the "confirming writing" that D–E signed, containing the New York governing law clause, apparently reflected the parties' expectations except for the cost figures. In our view, these niceties should not be determinative here.

From a practical standpoint, due to its involvement in this venture, Mainman should have reasonably anticipated being required to defend in Pennsylvania litigation over this transaction. Mainman initiated negotiations with D–E, located in Pennsylvania; Mainman was in contact with D–E on numerous occasions concerning the venture. Promotion of the Bowie concert required D–E to lease the Gardens, which Jim Ramos of CMA helped to arrange. The breach of that lease would foreseeably cause financial harm to D–E, a Pennsylvania corporate resident. The "confirming writing" was mailed into Pennsylvania where it was executed, and D–E mailed from Pennsylvania a substantial sum of money to Mainman as an "advance 'guarantee.'" In active, commercial negotiations such as these, we do not believe that Mainman could not anticipate being sued in Pennsylvania.

Mainman's contacts with Pennsylvania are no less substantial than were the Texas defendant's contact with California in *McGee*. In addition, Mainman, similarly to the Rhode Island buyer in *Empire Abrasive*, initiated dealings with a Pennsylvania corporate resident, which foreseeably had to enter in other obligations. Furthermore, Mainman requested D–E to send to it a substantial sum of money as an "advance 'guarantee,'" and Mainman has had prior, similar dealings in Pennsylvania. In light of the nature and extent of Mainman's dealings with D–E, a Pennsylvania corporate resident, we conclude that Pennsylvania courts can exercise sovereign adjudicatory authority over Mainman in this matter consistent with notions of "fundamental fairness." Thus, consistent with due process, this court can exercise personal jurisdiction over Mainman in this case. *See also Bean v. Winding River Camp Ground*, 444 F.Supp. 141 (E.D.Pa.1978) (no personal jurisdiction over foreign corporate defendant where plaintiffs initiated dealings between parties, the transaction involved merely the mailing of a $5.00 check and an application, no further acts of sub-contracting were required of plaintiffs); *Inpaco, Inc. v. McDonald's Corp.*, 413 F.Supp. 415 (E.D.Pa. 1976) (personal jurisdiction over foreign corporate defendant which bargained actively and entered into an agreement with plaintiffs upheld where defendant had unrelated business contacts with Pennsylvania); *Controlled Metals, Inc. v. Non-Ferrous Intern. Corp.*, 410 F.Supp. 339 (E.D.Pa. 1976) (personal jurisdiction over foreign corporate defendant that entered into contract with Pennsylvania plaintiff upheld where defendant initiated communications, actively negotiated with plaintiff, and sent shipping materials into Pennsylvania); *Proctor & Schwartz, Inc. v. Cleveland Lumber Co.*, 228 Pa.Super. 12, 323 A.2d 11 (1974) (exercising personal jurisdiction over foreign corporate defendant that was not "passive purchaser" in contract governed by Pennsylvania law).

## B. *Failure to State a Claim Upon Which Relief Can Be Granted*

Mainman contends that Counts II and IV do not state proper claims against it for the tort of interference with contractual or business relationships of D–E. According to these counts, Mainman and Bowie as "co-conspirators," "in concert" (presumably no pun was intended), or Mainman individually, knowing that the lease D–E had made concerning the Gardens was to D–E's economic advantage, "substantially retarded, prevented, and interfered with" D–E's rights in the lease "intentionally, willfully, and deliberately" by causing representatives of the Gardens to be informed that Bowie would not perform. Such allegations, construed in the light most favorable to D–E, must be taken as true for purposes of determining whether to grant a motion to dismiss; the complaint may not be dismissed unless it appears that D–E could prove no set of facts that would establish a claim for relief. *McKnight v. Southeastern Pennsylvania Transportation Authority*, 583 F.2d 1229, 1235–36 (3d Cir. 1978).

The gist of tortious interference with a business relationship is "the intent to destroy plaintiff's good will and reputation." *George A. Davis, Inc. v. Camp Trails Co.*, 447 F.Supp. 1304, 1310 (E.D.Pa. 1978). Where a defendant's breach of his contract with the plaintiff has only "an incidental consequence" of affecting plaintiff's business relationships with third persons, an action lies only in contract for defendant's breaches, including any recoverable consequential damages. *Glazer v. Chandler*, 414 Pa. 304, 200 A.2d 416, 418 (1974).

Here, for purposes of Mainman's motion to dismiss, we must accept D–E's allegations in the complaint that Mainman breached its agreement with D–E to produce Bowie for the concert at the Gardens for the purpose of damaging D–E's lease relationship for the Gardens. At this stage, we cannot say that D–E can show no set of facts to establish that Mainman cancelled the performance for that purpose, although the affidavits filed in this case suggest otherwise. Accordingly, Mainman's motion to dismiss for failure to state a claim upon which relief can be granted will be denied.