DIGITAL & ANALOG DESIGN CORPORATION, APPELLEE, *v.*
NORTH SUPPLY COMPANY, APPELLANT.

[Cite as Digital & Analog Design Corp. *v.* North Supply Co. (1989), 44 Ohio St. 3d 36.]

(No. 88-107—Submitted February 21, 1989—Decided July 5, 1989.)

40

*Wickens, Herzer & Panza,* Richard D. Panza, William F. Kolis, Jr., and *Thomas A. Downie,* for appellee.

*Gallagher, Sharp, Fulton & Norman, Forrest A. Norman, John B. Robertson* and *Robert H. Eddy,* for appellant.

*Murray & Murray Co., L.P.A., Dennis E. Murray* and *Kirk J. Delli Bovi,* urging affirmance for *amici curiae,* Nick J. Miller et al.

*Lucal & McGookey* and *James E. McGookey,* urging reversal for *amicus curiae,* Wikel Mfg. Co., Inc.

HOLMES, J. The thrust of appellant's propositions of law seeks review of the damages awarded, both compensatory and punitive. In analyzing such claimed errors, we must proceed being cognizant that the damage awards were made by this jury which had expressed its findings by way of its affirmative answers to the aforestated interrogatories.

## I

In its first proposition of law, regarding compensatory damages, NSC asserts that DAD's business finance expert witness, Dr. James E. Zinser, did not base his testimony regarding lost profits upon an analysis of lost *net* profits, and failed to make any deduction for the operating expenses of the company. More specifically, NSC contends that Dr. Zinser utilized an economic methodology, based upon a "gross operating [profit] margin." It therefore concludes that the lost profits were not demonstrated with reasonable certainty.

We have held that in order to have a recovery for lost profits, the aggrieved party must demonstrate the existence of such profits "with reasonable certainty." *Gahanna* v. *Eastgate Properties, Inc.* (1988), 36 Ohio St. 3d 65, 521 N.E. 2d 814, paragraph one of the syllabus. We have also determined that such party must show not only "(a) what he would have received from the performance so prevented, but also (b) what such performance would have cost him (or the value to him of relief therefrom). Unless he proves both of those facts, he cannot recover as damages the profits he would have earned from full performance of the contract." *Allen, Heaton & McDonald, Inc.* v. *Castle Farm Amusement Co.* (1949), 151 Ohio St. 522, 526, 39 O.O. 330, 332, 86 N.E. 2d 782, 784. Evidence which does not meet these thresholds must be considered speculative and an insufficient basis for an award of damages.

There are, in specific cases, as implied in *Allen, supra,* exceptions to the general rule requiring that plaintiff expressly prove its own costs for the generation of lost profits. For exam-

---

[1] This judgment was entered against DAD and Lisn Corporation, new party defendant. This judgment was not appealed.

ple, where there would have been no additional costs to the party to generate those profits which he lost, or where he was in fact not relieved from the particular costs which constituted his ongoing and fixed overhead costs, then he need only assert and prove such circumstances. As stated in *Allen, supra,* "If plaintiff would have been able to perform that work without incurring any additional cost, so that relief from the obligation of performing would not involve any benefit of value to plaintiff, plaintiff might be entitled to * * * [the entire gross profits]. 5 Williston on Contracts (Rev. Ed.), 3793, Section 1352. On the other hand, if the performance of such work would have cost plaintiff more than the amount claimed in the petition, then plaintiff would be entitled to recover nothing * * *." *Id.* at 525, 39 O.O. at 332, 86 N.E. 2d at 784. In this regard DAD's economic expert, Dr. Zinser, appeared to have considerable expertise in his field of economic analysis, with a large number of publications and professional activities to his credit. The evidence would reasonably support his technique of cost-profit analysis, the so-called "time-series analysis and projection." See Chambers, Mullick & Smith, How to Choose the Right Forecasting Technique, Harvard Business Review: July-August 1971.

NSC, by comparison, did not produce a comparable expert. Instead, NSC relied upon the testimony of a certified public accountant, and an employee controller of NSC, a Mr. Simon, neither of whom it appears had as extensive training or expertise in the time-series analysis method as had Dr. Zinser, and neither of whom utilized a competing method of analysis to calculate a lesser amount of lost profits. Instead, they merely offered their disagreements with Dr. Zinser's analyses. Having so devised its trial strategy relative to the issue of intermediate loss valuations, NSC has a limited stance in its assertions upon appeal in contending that the deduction of operating expenses from the gross profits for the period under consideration was the correct methodology to be used.

Dr. Zinser testified that the seizure of the inventory had severe repercussions upon DAD's business. After reviewing all of the financial and other records which were also entered into evidence, he concluded that as a result of the seizure of inventory on August 1, 1984, DAD had suffered a total loss in sales of $8,200,000. He then determined that the cost of sales was equal to 72.9 percent of gross sales, leaving a "gross profit margin" of 27.1 percent. Utilizing this margin, Dr. Zinser concluded that DAD lost profits of $12,706 in 1984; $306,914 in 1985; $698,154 in 1986; and $981,873 in 1987. After adjusting for various other factors, he concluded that the total lost profits was $2,014,330.

NSC, through its cross-examination of Dr. Zinser and by its own witnesses, attempted to show that DAD had suffered losses in every year of its operation. However, Dr. Zinser pointed out that such losses accrued by virtue of the opening of five branch offices, and that such expenses would have become fixed, *i.e.,* leveled off, so as to have had little or no effect on the future profits.

This specifically was an issue which was fully contested before the jury. The jury also had before it all of DAD's records which included profits, losses and costs of every kind. Furthermore, there was ample proof that DAD's overhead expenses actually continued for the period under consideration, and this much was admitted by NSC in its reply brief. The salient legal inquiry which emerges is not

whether such expenses became fixed, but instead, whether DAD paid such overhead expenses from whatever sales it achieved despite NSC's tortious conduct. Since such overhead expenses did continue, but were actually paid from DAD's sales made during the period of loss calculation, then NSC cannot be heard to argue that these same expenses should, as a matter of law, have been deducted from those sales which DAD lost during that time.

It would appear that, however calculated, there was evidence that the achievement of lost sales would not have resulted in increased costs such that the absence of sales resulted in a benefit of saved overhead expenses to DAD. See *Allen, supra.* Certainly, there was a sufficient production of evidence that the jury could lawfully have so concluded. Moreover, the jury actually rendered a verdict which was only some fifty-eight percent of the asserted lost profits. We conclude that the jury determination of the compensatory damages here was supported by competent credible evidence.

## II

NSC argues here, as it did in the courts below, that several employees of DAD were permitted to state, over objection, that others in the business community, including customers, creditors and competitors, had beliefs, and/or made statements, to the effect that DAD, due to all these surrounding circumstances, was bankrupt and/or that the seizure of its inventory was commonly known. This, NSC asserts, was an erroneous admission of hearsay evidence and, furthermore, allowed DAD to predicate damages involving lost profits, lost employees, and lost reputation upon mere rumors.

Evid. R. 801(C) defines "hearsay evidence" as "a statement, other than one made by the declarant while testi-fying at the trial * * * offered in evidence to prove the truth of the matter asserted." Not only must a statement be made by someone other than the testifying witness, which out-of-court statement such witness repeats on the stand, but the statement repeated must have as its primary value the showing of the truth which is asserted in the statement. *Potter* v. *Baker* (1955), 162 Ohio St. 488, 55 O.O. 389, 124 N.E. 2d 140. When viewed in context, the statements complained of by NSC were not adduced to prove anything contained within them, but only that they were, in fact, made. This is an entirely proper use of such out-of-court statements. In addition, as pointed out by DAD, and the courts below, there was considerable other evidence entered of record not only that such statements were consistently made by certain individuals, but that NSC was the fount of such beliefs. NSC had full opportunity to discover and call witnesses to refute such witnesses' alleged prior statements, had it so desired. The challenged testimony was neither hearsay nor prejudicial.

## III

NSC complains that the trial court refused to grant a directed verdict upon its counterclaim prior to submission of the issues to the jury. NSC points out that the trial court granted it a judgment notwithstanding the verdict after the trial, and infers therefrom that the trial court should have done likewise before the submission of evidence to the jury. It is argued that the harm of this alleged omission is that NSC was deprived of the opportunity to assert in its closing argument that "North's legal rights had been violated by DAD and that DAD was liable to North Supply." NSC felt that it was clearly disadvantaged and "painted * * * as a 'rogue' in the eyes of the jury" by the trial

court's decision to grant a partial verdict to DAD on the issue of conversion. NSC concludes that refusal to grant a directed verdict to it caused the jury to render verdicts based upon passion and prejudice.

There is little merit to NSC's assertion. We note that there is no challenge before us of the propriety of the partial directed verdict on the issue of conversion. Nor could such issue reasonably be raised, as the existence of the tort of conversion of inventory not sold by NSC to DAD is fairly obvious from the record. Regardless of the effect of granting such directed verdict, it was proper for the trial court to do so.

NSC's motion for directed verdict, on the other hand, could not reasonably have been granted at the time it was requested. It did not merely request that the jury be told that NSC was yet owed money on account, thus allowing the jury to determine the amount. Instead, NSC requested the trial court to specifically instruct the jury that $177,000 was due and owing upon its counterclaim. After a brief discussion of counsel, the trial court denied the motion. This was appropriate because the actual amount ultimately owed upon account was the subject of dispute at trial. Also, the trial court's grant of a judgment n.o.v. was for the amount of $135,253.12, which was somewhat less than the amount requested by NSC. Moreover, whether an amount was ultimately owed is quite different from the issue of whether it was due on August 1, 1984, at the time of the repossession or whether the existence of the debt constituted a default under the security agreement or the July 25, 1984 agreement. Thus, it was not error for the trial court to deny NSC's motion for a directed verdict.

## IV

In its third proposition of law, NSC attacks the award against it for punitive damages. Although technically asserting only one proposition of law, NSC in effect makes two assertions of error. It initially contends that there was no evidentiary basis presented which would allow the matter of punitive damages to be submitted to the jury, and that there was insufficient evidence presented to support the jury's verdict as rendered. In this latter regard, NSC argues that all of the punitive damages demands were premised upon a single animus, that of improper repossession of secured collateral, and that the punitive damages exceeded any single demand. It therefore urges the court to adopt a rule against the stacking of punitive damage claims which have been so premised, and under such circumstances, to limit punitive damages to a single award.

Ohio courts have allowed punitive damages based both upon punitive, as well as deterrent, philosophies. See, e.g., Simpson v. McCaffrey (1844), 13 Ohio 508, 522; Roberts v. Mason (1859), 10 Ohio St. 277; Atlantic & G.W. Ry. Co. v. Dunn (1869), 19 Ohio St. 162, 172; Detling v. Chockley (1982), 70 Ohio St. 2d 134, 24 O.O. 3d 239, 436 N.E. 2d 208; Preston v. Murty (1987), 32 Ohio St. 3d 334, 512 N.E. 2d 1174.

In a case seeking punitive damages, a jury must first determine that the defendant has acted with malice before determining the amount of punitive damages due to the plaintiff. Smithhisler v. Dutter (1952), 157 Ohio St. 454, 47 O.O. 334, 105 N.E. 2d 868, paragraph one of the syllabus; Pickle v. Swinehart (1960), 170 Ohio St. 441, 11 O.O. 2d 199, 166 N.E. 2d 227, paragraph two of the syllabus; Detling, supra, at 137, 24 O.O. 3d at 241, 436 N.E. 2d at 210. The necessary element of malice may be based upon evidence showing actual malice or malice by implication, i.e., legal malice. This court

has recognized that "[o]ne who has committed an act would scarcely admit that he was malicious about it, and so, necessarily, malice can be inferred from conduct." *Davis* v. *Tunison* (1959), 168 Ohio St. 471, 475, 7 O.O. 2d 296, 298, 155 N.E. 2d 904, 907. Our prior cases have identified two general categories of conduct by which malice may be shown, either actual or by inference. As set forth in the syllabus of *Preston, supra,* punitive damages may be awarded upon proof of conduct "(1) * * * characterized by *hatred, ill will* or *a spirit of revenge, or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis added in part.)

In considering the first of NSC's assertions, a combing of the record adduced at trial reveals that there was no evidence presented that NSC was actuated by ill will, hatred, a spirit of revenge or any other desire to vent particular feelings upon another. If, for instance, there had been an express showing that NSC had intended to put DAD out of business, or had intended to obtain DAD's installation business for itself, then such conduct would have supported a finding of actual malice based upon hatred, ill will or spirit of revenge. *Detling, supra,* at 136-137, 24 O.O. 3d at 241, 436 N.E. 2d at 210; *Pickle, supra; Rogers* v. *Barbera* (1960), 170 Ohio St. 241, 10 O.O. 2d 248, 164 N.E. 2d 162.

However, looking to the record here to see whether the other standard of *Preston* has been met, *i.e.,* whether the defendant acted with a "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm," we find that DAD presented sufficient evidence to show that NSC planned its actions in advance; that the probable results of NSC's actions would do harm to DAD's business because NSC was DAD's major supplier; that the rights of DAD, so established by contract and otherwise, were quite obvious to those in NSC's position; that the various actions by NSC disregarded DAD's property rights and business rights; and that there was a conversion of inventory which was known to have been purchased from other suppliers, but yet had been intentionally seized.

We therefore conclude that the jury was presented with sufficient evidence from which it might reasonably infer malice from the circumstances, finding that NSC acted "with a conscious disregard for the rights of other persons that has a great probability of causing substantial harm." Having so concluded, it was quite appropriate for this jury to have determined that there had been a sufficient showing of legal malice upon which punitive damages may have been assessed.

In its third proposition of law, NSC asserts that, as previously mentioned, an award of damages cannot exceed the punitive damages prayed for in the complaint. This appears to be set forth in Civ. R. 54(C), relied upon by NSC, and which states that "a demand for judgment which seeks a judgment for money shall limit the claimant to the *sum claimed in the demand * * *.*" (Emphasis added.) This is further buttressed by our recent decision in *Bishop* v. *Grdina* (1985), 20 Ohio St. 3d 26, 20 OBR 213, 485 N.E. 2d 704, in which we held that a punitive damages award must be stricken to the extent that it exceeds the amount prayed for in the complaint.

In the case *sub judice,* DAD's complaint requested a punitive damages award of $1,000,000 in each of four of its eight counts, which, of course, seeks a total possible punitive damages award of $4,000,000. NSC contends that all four of the counts assert claims

premised upon a single animus, that of unlawfully acting pursuant to its security agreement. It concludes that it should, therefore, be punished only once, and that as measured by the total amount of punitive damages requested in any single count. We agree with this conclusion.

We believe it is a reasonable conclusion that out of a sense of fairness, in an action seeking punitive damages, the law should not countenance one to be punished repeatedly for the same act or allow multiple recoveries for such act. Accordingly, punitive damages may not be awarded more than once for a single act.

The issue becomes more complex when a series of acts amounting to one or more courses of conduct have occurred, for thereby any number of torts may have been committed. This is complicated further in that such series of acts could conceivably be determined to be with multiple rather than a single animus, and thereby constitute the commission of a number of torts upon which punitive damages may be assessed. We are persuaded that when it is shown that a course of events is governed by a single animus, even though a defendant may be liable to compensate plaintiff for the damages occasioned by a number of torts committed in such course of events, defendants may only be punished once by a single award of punitive damages. Recoveries for multiple claims for punitive damages, contained within separately pleaded tort theories, may not be combined, or stacked, when such multiple tort claims arise from the same animus.

Turning now to the jury award of $1,500,000 in the instant case, we note that such award exceeds any single punitive damages demand by $500,000. Further, the award is undifferentiated and ostensibly based upon any two, or all four, of the punitive damages claims. Thus, the award of the excess amount may be sustained only if, among the four counts of DAD's complaint in which punitive damages were demanded, there may be found more than one course of events, each of which may be said to have been actuated by an animus unrelated to the others. This requires an analysis of each of the four counts and the proven events to which they relate.

The principal actions of NSC center around its August 1, 1984 seizure of inventory located in DAD's warehouse and protection of its interests under the security agreement. Thus, in its third count, which contains the first demand for punitive damages, DAD sought punitive damages for the tort of conversion. Similarly, in the eighth count for relief, it asserted that NSC "in order to wrongfully seize the chattels referred to above * * * maliciously and intentionally trespassed onto Plaintiff's premises." By their terms, the factual basis upon which both of these torts are premised is the series of events occurring during the seizure of inventory on August 1. Although there was sufficient evidence to support a finding that each tort was individually committed, it is also true that both torts sprang from a single animus, that of seizing inventory, considered to be secured collateral in order to protect NSC's exposed position as a creditor. Thus, only one punitive damage award can be justified despite the fact that two separate torts may have occurred during this activity.

The fourth count of DAD's complaint asserted an entitlement to punitive damages because of NSC's breach of the July 25, 1984 agreement. This breach is described as having been "willful, wrongful and malicious." The law is quite clear in Ohio that: " 'As a general rule exemplary damages are not recoverable in actions for the

breach of contracts, irrespective of the motive on the part of defendant which prompted the breach. No more can be recovered as damages than will fully compensate the party injured.' " *Saberton* v. *Greenwald* (1946), 146 Ohio St. 414, 426, 32 O.O. 454, 458-459, 66 N.E. 2d 224, 229, quoting 25 Corpus Juris Secundum, Section 120, at 716. This has been the nearly universal rule for some time: see, *e.g., Hadley* v. *Baxendale* (1854), 9 Ex. 341, 156 Eng. Rep. 145; Restatement of the Law 2d, Contracts (1981) 154, Section 355; Farnsworth, Contracts (1982) 842-844, Section 12.8. No matter how willful the breach, "[p]unitive damages are not recoverable in an action for breach of contract." *Ketchum* v. *Miller* (1922), 104 Ohio St. 372, 136 N.E. 145, paragraph two of the syllabus. Accordingly, count four provides no basis for the jury to award punitive damages since it is an express claim for breach of contract. It does, however, set forth a sufficient basis for a finding of both compensatory and consequential damages.

The remaining claim for punitive damages is based upon the seventh count which, in essence, alleges that NSC tortiously interfered with DAD's business relations. A review of the wording in this count indicates that it contemplates, as factual bases for the tort, any and all of the following: the seizure of inventory from the warehouse on August 1, 1984; the seizure of funds, later determined to be approximately $80,000, owed to DAD by NSL; and the seizure of in-transit inventory or repossession of inventory which had been paid for by DAD with a $38,500 check. This amount was also retained by NSC and applied upon DAD's account. An analysis of these factual predicates reveals that none of them suffices to justify an independent and separate award of punitive damages.

As previously mentioned, the seizure of inventory from the warehouse on August 1, 1984 is a factual basis which is shared with that underlying both the conversion and the trespass claims. This seizure, whether or not it supports independent and additional awards in tort, is for purposes of a punitive award but one event, possessing one central animus. It does not, therefore, independently constitute another basis for a punitive damages award by its additional recitation within this count.

The seizure of the funds owed DAD by NSL for work performed and their application upon NSC's account, is explainable in two ways, either of which may reasonably negate the punitive damages aspect. First, although not a part of the acts comprising the warehouse seizure, it was nonetheless actuated by the same demonstrable animus as the warehouse seizure, *i.e.,* to obtain the collateral described in the security agreement for the purpose of protecting its exposure. The security agreement granted to NSC a security interest in all accounts receivable which were obtained by the use of any inventory sold to DAD by NSC. This reasonably included the amounts owed to DAD by NSL for installing NSC inventory. Second, as a matter of fact and law, the mere refusal to pay money owed, where the parties are in privity of contract, constitutes nothing more than a breach of contract for which punitive damages generally cannot be awarded.

It is well established that "though a breach of a duty under a contract or lease necessarily interferes with the injured party's business relations with third parties, the injured party is limited to an action for breach of contract and may not recover in tort for business interference." *Cherberg* v. *Peoples Natl. Bank of Washington* (1977), 88 Wash. 2d 595, 604, 564 P. 2d

1137, 1143; *Glazer* v. *Chandler* (1964), 414 Pa. 304, 200 A. 2d 416; *Kvenild* v. *Taylor* (Wyo. 1979), 594 P. 2d 972, 977; *Bolz* v. *Myers* (Mont. 1982), 651 P. 2d 606; *N.A. Berwin & Co.* v. *American Safety Razor Corp.* (Sup. Ct. 1951), 108 N.Y. Supp. 2d 677. An exception exists, and a tort action may lie, only where the breaching party indicates, by his breach, a motive to interfere with the adverse party's business relations rather than an interference with business resulting as a mere consequence of such breach. *Cherberg, supra.* In the instant case, there is no evidence of such motive which would create an action in tort. Therefore, regardless of the form in which it was pleaded, DAD's action remains no more than a breach of contract action, identical in all respects to count six.

The third seizure is somewhat more troubling. The decision to seize the apparently in-transit inventory or to repossess it and to apply the cash payment of $38,500 upon account cannot specifically be found to be within the single animus of obtaining secured collateral. This conclusion is based upon the security agreement which, by its express terms, creates a security interest only in those inventories which were purchased from NSC on credit. The inventory here, which was set aside and identified to the contract, was paid for in cash. Accordingly, this was not a seizure of secured collateral, but was instead a breach of a transaction which was entirely separate from all other transactions between the parties. It was therefore a separate animus, even though generally done for the same purpose as the warehouse seizure.

This seizure, although framed in the plaintiff's argument as part of a tortious interference with business count, is, upon the law, pleadings, and record before us, indistinguishable from the breach of oral contract claim in count five, which sets forth all the above facts, including the existence of a contract between the parties. Of course, the jury was requested by interrogatory to state whether such facts additionally constituted the tort of conversion. They unanimously concluded that the amount of $38,500 was in fact tortiously converted. Unfortunately, DAD's complaint makes no mention of a tortious conversion relative to either the amount applied upon account or the inventory seized in transit. The issue was therefore improperly before the jury, although not prejudicially so. The only facts asserted in either counts five or seven describe, in essence, a breach of oral contract claim.

Moreover, in both of the latter two applications of funds upon account, and the seizure of inventory in transit or repossession thereof, the specific existence of both respective contracts was firmly established at trial. Since the breach of these contracts created, at best, only the "incidental consequence" of affecting DAD's business relationships with third persons, only an action in breach of contract exists, for which no punitive damages may be obtained. See *DiCesare-Engler Productions, Inc.* v. *Mainman Ltd.* (W.D. Pa. 1979), 81 F.R.D. 703, citing *Glazer, supra; Cherberg, supra.*

In sum, tortious activity for which a punitive damages award may be sustained occurred in only three of the four counts above. Furthermore, we hold that such tortious activity arose from a single animus, and thus NSC may be punished by only a single punitive damages award. In that DAD requested the amount of $1,000,000 in each of the above three counts, the jury's award for $1,500,000 must be reduced to that sum claimed in any one such demand.

Having considered the asserted

propositions of law, we conclude that the judgment of the court of appeals is affirmed in all respects except that, for the reasons set forth above, the award of punitive damages shall be reduced to a total amount of $1,000,000.

*Judgment affirmed in part and reversed in part.*

MOYER, C.J., SWEENEY and H. BROWN, JJ., concur.

DOUGLAS and RESNICK, JJ., concur in part and dissent in part.

WRIGHT, J., concurs in part and dissents in part.

ALICE ROBIE RESNICK, J., concurring in part and dissenting in part. I concur in the majority's opinion as to Parts I, II and III. I, however, dissent as to the syllabus and the majority's holding as to Part IV.

The majority holds that the tortious activity arose from a single animus and therefore appellee is only entitled to $1,000,000 in punitive damages. I disagree with the majority's finding that all claims arise from a single animus. I would affirm the award of punitive damages in its entirety, since I find in addition to the seizure of the inventory on August 1, 1984, there was sufficient evidence before the jury to find that appellant, subsequent to the seizure of appellee's goods, continued to interfere with appellee's business, and that such interference was not merely incidental to a breach but rather there was evidence from which a jury could find that the actions of appellant or its agents were willful, wrongful, and malicious — thus creating a separate animus upon which punitive damages could be awarded.

I would affirm the judgment in its entirety.

DOUGLAS, J., concurs in the foregoing opinion.

WRIGHT, J., concurring in part and dissenting in part. The dynamics of a trial preclude perfection since the price of such a standard is prohibitive. Thus, I can understand the majority's reluctance to disturb the jury verdict in this case. However, in my view the majority opinion misperceives the commercial process when it places credence in the testimony of plaintiff's expert witness as it related to compensatory damages.

We have consistently held that the existence and amount of lost profits must be proven with certainty. "In order for a plaintiff to recover lost profits in a breach of contract action, the amount of the lost profits, as well as their existence, must be demonstrated with reasonable certainty." *Gahanna* v. *Eastgate Properties, Inc.* (1988), 36 Ohio St. 3d 65, 521 N.E. 2d 814, syllabus (explaining *Charles R. Combs Trucking, Inc.* v. *International Harvester Co.* [1984], 12 Ohio St. 3d 241, 12 OBR 322, 466 N.E. 2d 883). For the reasons that follow, the method of calculation adopted by plaintiff's expert is so flawed as to require a new trial.

Dr. Zinser failed to properly set forth with any degree of reasonable certainty the amount of lost profit damages. He utilized an economic methodology for proving lost profits which is at war with the legal standard for awarding damages as noted above. The law in this state requires that evidence of lost profits be based upon an analysis of lost "net" profit *after* the deduction of *all* expenses impacting on the profitability of the business in question. Dr. Zinser noted the distinction between the analysis of lost profits based on net profits (*i.e.,* gross sales less cost of goods sold *and* operating expenses) and the "gross

operating margin" of profit (gross sales less only the cost of goods sold). I believe the substantive law of Ohio requires testimony using the first standard. This methodology was ignored in this case, and Zinser's testimony was keyed to the unrealistic and inaccurate approach arising out of gross profit margins.

A graphic demonstration of the problem presents itself here where the plaintiff's expert posited a twenty-seven percent profit margin on a hypothetical sales figure of $8,200,000.

Zinser's testimony transformed a company that had never shown even a modest profit into a veritable money machine. Given the state of the whole record I find Dr. Zinser's testimony fanciful at best, at worst outrageous, and certainly not within the confines of "reasonable certainty."

Accordingly, I would grant a new trial on the issue of compensatory damages, with liability not an issue. I concur with Justice Holmes in his analysis of the punitive damages aspect of this case.