[Cite as *Acme Co. v. Saunders TopSoil*, 2011-Ohio-6423.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| THE ACME COMPANY, | ) | |
| | ) | CASE NO. 10 MA 93 |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| - VS - | ) | OPINION |
| | ) | |
| SAUNDERS & SONS TOPSOIL, | ) | |
| | ) | |
| DEFENDANT-THIRD-PARTY | ) | |
| PLAINTIFF-APPELLANT, | ) | |
| | ) | |
| - VS. - | ) | |
| | ) | |
| R & J TRUCKING, INC., et al., | ) | |
| | ) | |
| THIRD-PARTY DEFENDANTS | ) | |
| -APPELLEES. | ) | |

CHARACTER OF PROCEEDINGS: Civil Appeal from Common Pleas
Court, Case No. 08 CV 4435.

JUDGMENT: Affirmed.

APPEARANCES:

For Plaintiff-Appellee: No Brief Filed.

For Defendant-Third-Party
Plaintiff-Appellant: Attorney Robert E. Duffrin
7330 Market Street
Youngstown, OH 44512

Attorney Scott C. Essad
5815 Market Street, Suite 1
Youngstown, OH 44512

For Third-Party Defendants-Appellees: No Brief Filed.

JUDGES:
Hon. Mary DeGenaro
Hon. Cheryl L. Waite

Hon. Joseph J. Vukovich

Dated:  December 7, 2011

DeGenaro, J.

{¶1}   Defendant-Appellant, Saunders & Sons Topsoil, appeals the decision of the Mahoning County Court of Common Pleas, awarding judgment to Plaintiff-Appellee, the Acme Company, in the amount of $6,249.89 and awarding $1.00 in nominal damages to Saunders for conversion damages.  Saunders asserts that the trial court erred when it only awarded nominal damages after finding that Acme had converted Saunders's topsoil.  Saunders also alleges that the court erred when it awarded judgment to Acme for unjust enrichment and for the amount in R & J Trucking, Inc.'s accounts receivable.  The four arguments are meritless.

{¶2}   First, Saunders did not prove lost profits damages with reasonable certainty because it failed to provide any evidence as to its costs in processing the topsoil, and the sale price of the topsoil appeared to be speculative.  Second, Saunders did not sufficiently prove conversion damages because its evidence regarding the amount and value of the unprocessed topsoil was speculative.  Third, Acme adequately set forth a claim for unjust enrichment, and fourth, R & J properly assigned its right to payment under the contract to Acme, thus Acme can recover those damages. Accordingly, the judgment of the trial court is affirmed.

## Facts and Procedural History

{¶3}   In June of 2006, Canfield High School was removing its natural grass football field and installing artificial turf.  David Mosure, an engineer for the project, contacted John Saunders of Saunders & Sons Topsoil and told Saunders that he could have the topsoil excavated from the football field for free if he removed the soil from the field.  According to Saunders, Mosure suggested that Saunders use R & J to haul the soil because R & J was working on the project.

{¶4}   Saunders spoke with Mark Carrocce of R & J and agreed on an hourly price to remove the topsoil from the field.  Saunders also contacted Jeff Schrum and made arrangements to store the topsoil at Schrum's property.  The topsoil needed to be removed from the football field over a two day period, and Saunders told Carrocce that he would supply one truck on Saturday and two trucks on Sunday and that only three additional trucks from R & J would be needed.  Carrocce contacted Daniel Zarlenga, president of Acme Company, and Zarlenga agreed to supply three trucks to help R & J

haul the soil. According to Zarlenga, he determined that six trucks were needed to remove the topsoil in the two-day timeframe.

{¶5} On June 17, 2006, the work began to transport the topsoil from the Canfield football field to Schrum's property. Acme and R & J each brought three trucks. According to Saunders, he informed Carrocce that only three trucks were needed, but Carrocce replied that they would see how things went. Saunders claims that at the end of the day, he told Carrocce to bring only three trucks on Sunday and Carrocce agreed. On June 18, 2006, Acme and R & J again each brought three trucks to complete the job.

{¶6} Saunders received bills from both Acme and R & J for transporting the topsoil, but due to the disagreement over the number of trucks, he did not pay either bill. In June of 2007, Acme removed the topsoil from Schrum's property and transported it to its own property.

{¶7} Acme filed a complaint in county court against Saunders alleging two claims; first, that it provided services to Saunders in the amount of $3,849.25 and attached an invoice to Saunders for its services; and second, that R & J had provided services to Saunders in the amount of $3,078.01, and Acme purchased the receivable of R & J which Saunders had refused to pay. The case was transferred to common pleas court on November 6, 2008 because Saunders's counterclaim and third-party complaint exceeded the county court's jurisdictional amount.

{¶8} On November 12, 2008, Saunders filed an amended answer and counterclaim in the common pleas court. Saunders admitted that Acme had demanded payment and Saunders refused, but it denied the rest of the allegations. In its counterclaim, Saunders asserted four claims. First, that R & J breached its implied duty of good faith and fair dealing, rendering the contract unenforceable, and that Acme, as assignee, has no greater rights to enforce the contract than R & J. Second, that Acme removed Saunders's topsoil without its permission, and Saunders demanded the soil be returned but Acme refused. Third, that Acme converted its property, and finally, that Acme was unjustly enriched. Saunders also asserted third-party claims against Schrum and R & J, but those claims are not a part of this appeal. Saunders prayed that the court dismiss Acme's complaint with prejudice and prayed for judgment on its counterclaim and

third-party complaint for, inter alia, $50,000.

{¶9} On February 25, 2007, Saunders was granted leave to file a second amended complaint. In 2009, the parties filed reciprocal motions for summary judgment which were denied. On January 25, 2010, Saunders filed a motion to amend its counterclaim to change each prayer for relief from demanding $50,000 to a demand "in excess of $25,000."

{¶10} On January 26, 2010, the court issued a subpoena to Dan Zarlenga of Acme to give testimony at trial and bring the following documents:

{¶11} "1) All records relating to the sale of any topsoil from The Acme Company, including purchase price and how many cubic yards were sold during the past two calendar years * * *.

{¶12} "2) Records related to the payment of employees or contractors regarding the trucking and removal of soil from property owned by Jeff T. Schrum for the last two calendar years (2009 & 2008.)"

{¶13} A bench trial to the magistrate commenced January 26, 2010. Daniel Zarlenga testified that regarding the Canfield football field project, Acme donated their time and handled excavation of the topsoil from the field. Zarlenga explained that he did not contract with Carrocce regarding removing the soil from the field, but rather, it was a community project. He had no contact with Saunders before he sent him a bill for the job; he let Carrocce coordinate the conditions of payment with Saunders.

{¶14} Zarlenga testified that the topsoil he excavated from the field had roots, grass, and plastic drains in it. He did not have time to remove the debris in the soil to attempt to salvage it. The soil had no value to him because of all the contaminants in it and because there was an abundance of soil in the marketplace. On cross, Zarlenga clarified that the soil was worthless unless it was screened, cleaned and processed. Then the soil's value is whatever it can be sold for at the time. Zarlenga further testified that he sells unprocessed topsoil out of his yard for $1-$2 a ton, and he sells processed, screened, and shredded topsoil for $10-$11, but that he had sold "very, very little" cubic yards of topsoil in the last two years. Regarding the shelf life of topsoil, he testified that

unprocessed topsoil does not spoil if is piled, covered, and seeded. Although topsoil was a small segment of his business, Zarlenga understood the different grades of soil. The soil removed from the Canfield football field was unprocessed, excavation soil, which is a low grade that needed to be screened to remove the plastic, shredded, and sterilized, which costs money. He stated that the excavation soil was worth what it costs to haul it away.

{¶15} Zarlenga explained that Plaintiff's Exhibit 7 was a determination of how many cubic yards of soil would need to be removed from the Canfield football field. He had calculated that they would remove between 1,900 and 2,500 cubic yards of soil, but estimated that they actually removed about 2,100 cubic yards from the field.

{¶16} Zarlenga stated that his three-axle trucks can carry between 11 and 14 cubic yards of topsoil. He said that he did not keep track of the loads that his trucks made when removing the soil from the football field, and although there were tally marks on the trip tickets, the drivers might forget to put a mark down for each load. He said that there was no requirement for them to keep load counts. He further explained that the tally marks were not useless, but they might be plus or minus a load or two. Zarlenga confirmed it was a fair assessment that the tally marks on the trip tickets are between 90 and 100 loads. Zarlenga stated that the trip tickets were used for payroll records and for billing the customer, and that the tickets recorded the total hours the driver worked.

{¶17} Zarlenga identified Plaintiff's Exhibit 14 as an invoice to Saunders for hourly trucking at Canfield High School, which was made the following week of the job. He said that the invoice was sent to Saunders, but Saunders never paid nor contacted him about the invoice. He said that his own correspondence went through Carrocce, but he thought that after six or seven months, Acme may have made a couple calls to Saunders in an attempt to get paid.

{¶18} Zarlenga testified that in the summer of 2007, Schrum was going to build pole barns on the land where the soil was sitting and had contacted Zarlenga to borrow a roller. Zarlenga told him that the topsoil was in the way, and Schrum said that he was trying to get it off the property, but it was moving very slowly. Zarlenga said that Saunders had not paid him for trucking the soil and that he would move it, assuming the

soil was Schrum's property because it was on his land. He also testified that Saunders had his shredder and screening plant on Schrum's property and was processing soil on the premises.

{¶19} Zarlenga hauled the topsoil away to his yard at the cost to remove it and added it to a pile where he dumped topsoil when he did excavation and would later sell the soil on a commercial or industrial project. He further testified that if he considered the soil to have any value when he did the project, he would have taken it himself. He testified that he did not want the soil because it had no value to him; he said that he already had an abundant pile of topsoil and did not need it. However, on cross, he stated, "[t]he expense of loading the dirt and hauling it away, I didn't get paid for that, too. And the pay was I got the damn dirt. That's all I got. So, yeah, I didn't make nothing on that and I still had an unpaid bill."

{¶20} Zarlenga testified that it took two afternoons to haul the soil off of Schrum's property in June of 2007. He did not recall how many trucks he used and stated that he did have trip tickets for that. He confirmed that he received a subpoena indicating to bring his records with him; however, he did not bring the trip tickets because the subpoena requested documents from 2008 and 2009, and he removed the soil from Schrum's property in 2007.

{¶21} Regarding purchasing R & J's bill, Zarlenga said: "I agreed to pay Mark's bill so that there wasn't no argument down the road about the dirt because he claimed, you know, we still owned the dirt. We both owned the dirt. I didn't want to get in an argument with my other business associate that I work with in the community so I agreed to pay Mark's bill. I wrote him a check more just so I didn't have no problems down the road. And technically what I did was I said I'll buy your receivable for whatever the Saunders' bill was and he gave me the bill and I wrote him a check for it."

{¶22} Zarlenga testified that not all of the original soil was there when he removed it from Schrum's property a year later, but he did not know how much was left. He said that Saunders had sold some of the soil. He later testified that in June 2007, there was "400, 500, maybe 600 yards there roughly," and the soil was spread out, rather than in one big pile. He agreed that at least a portion of the soil pile was not the original soil that

was brought in 2006 because other soil had mixed with Saunders's pile.

{¶23} Zarlenga testified that he has sold pulverized, unprocessed, and fill soil to Custom Blended Soils, Inc. for $1 per cubic yard from his property on Western Reserve Road, although he is receiving credit towards processed topsoil from them rather than cash payment. He stated that CBS is selling the soil to him for $10 or $11 a ton when he picks it up, and then when he sells it, he has to add delivery costs to that price. He testified that he puts most of the markup in his transportation. Zarlenga identified Plaintiff's Exhibit No. 15 as the summary of the soil that CBS took off his property in 2009 for $1 per cubic yard. Zarlenga testified that based on this he would say that the value of the soil taken from Schrum's property was about $3 to $4 per cubic yard because that is what it cost him to haul it away.

{¶24} Zarlenga explained that Saunders's topsoil was taken to his Harvard Boulevard yard and it is now gone. He said he was 99 percent sure that it went to Cleveland into an area where Acme digs up tanks and sells unprocessed topsoil to cover up seed. Zarlenga stated that the bidding price for the soil on that project varies depending on where the job is located, and Acme sells unprocessed topsoil from $5-$14 per ton depending on where it has to transport the soil. Zarlenga explained that if he hauls a load to Cleveland, it costs $180. He further explained that if he uses a semi, it hauls 20 tons and costs roughly $8 a ton to haul the soil to Cleveland. He then takes the $8 and adds it to what he wants for the material cost, and that is his delivered price. Counsel then asked if he was getting approximately $10 to $12 per ton at the Cleveland project, and Zarlenga replied, "Yes. At least I'm hoping at least. I don't know."

{¶25} John Saunders testified next. He stated that he has been in the topsoil business since 1982. He explained that for his topsoil business, he usually purchases dirt from construction sites, paying anywhere from nothing to $4 per cubic yard. He then reprocesses the soil by putting it through his shredder and he also mixes compost with the soil. He explained that when soil is blended with compost, it becomes very enriched in comparison to plain topsoil, allowing plants to grow larger. He also stated that he charges the same amount for plain topsoil as for compost-topsoil mix.

{¶26} Saunders also explained why the soil from the Canfield football field was

better than other soil: "Well, when you have soil like that there's a sand mixed with it plus other, probably some other chemicals, but fertilizers with it to make it grow and stay nice and green because they want the field looking tremendous. You're going to have to fertilize it. It starts off a good batch of fertilizer and some sand to keep it porous so the water can get down to the roots."

{¶27} Regarding his agreement with R & J to remove the soil from the field, Saunders testified that he accepted their services, but that there was not a written contract between them. He said that he did not have a contract with Acme. Saunders called Carrocce who quoted a price of $73 per hour to transport the soil. Saunders testified that he determined only three extra trucks besides his own were needed because it was not profitable to have trucks waiting to be loaded. Saunders explained that when Carrocce had called regarding the bill, he had told him that he was willing to pay for three trucks, but Carrocce wanted the money for the hauling for all six trucks.

{¶28} Saunders testified that he could have sold the soil from the Canfield football field in his business. When he bargained with R & J to transport the soil, he was planning to mix the soil with an equal amount of compost, giving him twice the amount of material to sell. Saunders further testified that the soil contained plastic pipes, but they did not affect the value for him because he has a shredder to remove them from the soil. He explained that he had a machine on Schrum's property to process the topsoil stored there, and he used the machine there.

{¶29} By his own calculations on Defendant's Exhibit E, Acme and R & J together removed 3,312 cubic yards of soil from the Canfield football field. Saunders first calculated that five-axle dump trucks haul between 16 to 20 cubic yards of soil, based on information he received from several trucking companies. He then calculated that, on average, the trucks moved 2 loads per hour based on the trip tickets. Saunders's counsel clarified that although not all of the trip tickets recorded the number of loads, this figure was based upon the trip tickets that did record the loads. Saunders used an average figure of 18 cubic yards per load multiplied by 2 loads per hour, totaling 36 cubic yards of soil hauled per hour. Acme stipulated that Acme and R & J billed for 92 hours of work. Saunders then multiplied the 36 cubic yards of soil per hour by the 92 hours worked,

totaling 3,312 cubic yards of soil removed from the field.

**{¶30}** However, during Saunders's testimony regarding Defendant's Exhibit E, the court referenced Carrocce's earlier testimony where he stated that the trucks R & J used held 14 to 16 cubic yards of soil. Saunders's counsel said that they would use 15 cubic yards in their calculation, but Acme later objected to this figure because Zarlenga had earlier testified that Acme's trucks held 11 to 14 cubic yards of soil. The court sustained the objection, and Saunders's counsel then used a figure of 13 cubic yards. Saunders agreed that using Acme and R & J's figures, they removed about 2,500 cubic yards of soil from the football field.

**{¶31}** By his calculations, Saunders removed 704 cubic yards of soil from the football field with his own trucks. On Saturday, he used a single-axle truck carrying 12 cubic yards of soil. He worked 8 hours, carrying 2 loads per hour. He calculated 24 cubic yards per hour multiplied by 8 hours, totaling 192 cubic yards. On Sunday, he again used his single-axle truck for 8 hours for a total of 192 cubic yards of soil. He also used his two-axle truck, which carried 20 cubic yards for 8 hours, totaling 320 cubic yards of soil. Saunders's counsel then added 704 cubic yards that Saunders's trucks hauled to 2,581 cubic yards that Acme and R & J hauled, totaling 3,285 cubic yards of soil removed from the field in June of 2006.

**{¶32}** On cross, Saunders testified that he had created Defendant's Exhibit E in anticipation of litigation shortly after filing his counterclaim. He further testified that no one knew the exact amount of soil that was taken from the Canfield football field to Schrum's property.

**{¶33}** Saunders testified that the pile of soil decreased between June 2006 and June 2007. He said that he sold some plain topsoil to Foust Construction for $14 per cubic yard and referred to Exhibit C, the two statements he sent to Foust. He further testified that he donated 40 cubic yards of topsoil to Canfield Township, and this soil would have also been worth $14 per cubic yard. However, on cross, counsel referred to page 81 of Saunders's deposition, where he had testified that he believed he had donated 8 loads at 8 cubic yards per load to the township. He explained that he does not keep records when he gives soil away.

**{¶34}** Saunders also removed 10 or 11 cubic yards of soil for his own use. On cross, Saunders testified that he also took one load to his lot on Barth Farms. Counsel then referred to Saunders's deposition where he had testified that he took two loads to Barth Farms and one load to his house. Saunders replied that he made a mistake, but then stated that he knew how much soil he had removed: "I took out 10-yard loads so if I take two loads, 20 yards to Barth Farms and 10 yards to my place at 5138 Leffingwell." He further testified that he calculated the loads he took to his house based on the amount his bucket holds.

**{¶35}** He testified that he did not sell any more of the soil in the year it was on Schrum's property because he had his site off Western Reserve Road with his supplies. He stated that it was easier to use this site by the freeway than to go out to Schrum's property. On cross, he also testified that there was soil taken out of the west side of the pile and he did not know who took it. He later stated that he allowed Schrum to take soil out of the pile, but he did not know how much Schrum took. Saunders also told Schrum that if friends of his needed topsoil, it would be fine for them to take a load or two.

**{¶36}** On recross, Saunders testified that the topsoil he sold to Foust was processed, but that the unprocessed topsoil was not worth less than the processed topsoil. He stated that he does not sell unprocessed soil, explaining: "Why would I go through the expense of having a machine that does this and then give a person a product that they're going to have problems with?" He confirmed that the soil stored on the Schrum property was unprocessed, but the value he calculated for the soil on Defendant's Exhibit E was for processed soil. He also confirmed that he could not give a value for the unprocessed soil. Counsel also referred to page 19 of Saunders's deposition testimony, where he had agreed that when calculating the value of the processed topsoil, there would be a deduction for the additional cost of transporting it from Schrum's property to Barth Farms and processing it there.

**{¶37}** Saunders testified that he sold the soil to Foust for $14 per cubic yard because Foust was purchasing a large quantity and it was a short haul, so he lowered the price. He stated that his price is normally $17 per cubic yard; he also currently charged $17 per cubic yard for his topsoil-compost blend. Regarding the current value of the soil

he sold to Foust, he stated: "Now it is up in the 20s. From what I heard from competitors it goes anywhere were 17, 18 up to 25, 26." He further testified that selling topsoil in Mahoning County was tough because of the economy. He stated that since the job in June 2006 to the present, he had been selling topsoil, and he could have sold the soil from the Canfield football field throughout that time. Saunders testified that when Acme removed the topsoil from Schrum's property, he did not have any contracts for the sale of that topsoil.

**{¶38}** Saunders did not know the exact size of the pile remaining in June of 2007 and stated that was because "no one actually knew what the size of the pile was we brought in." He confirmed that he had no idea how much soil Acme took because of the soil removed from the west side of the pile.

**{¶39}** Saunders calculated the amount of soil Acme removed from Schrum's property in June of 2007: 3,285 cubic yards of soil originally hauled to Schrum's property, subtracting 586 cubic yards sold to Foust, 40 cubic yards donated to Canfield Township, 10 cubic yards for his personal use, and 20 cubic yards to Barth Farms, equaling 2,629 cubic yards. Regarding the percentage of the pile missing from the west side, Saunders stated: "I'd say it had to be a very small – single digit, two or three percent of the pile, if that. I couldn't – it's hard to tell the depth from the outside of the pile that was there to the – to the depth that it was in, so it would be a small amount." He further explained that he would be able to judge the percentage missing based on his experience by seeing how the contour of the pile appeared. Saunders agreed to use a figure of 5 percent of the pile missing, and his counsel calculated 2497.55 cubic yards of soil remaining.

**{¶40}** On cross, counsel referred to Saunders's deposition where he testified regarding the amount of soil missing from the west end of the pile. Counsel asked if Saunders had testified that a big portion was missing. Saunders replied: "Well, it was a large pile. The depth of the indentation into the pile – if you look at something, and you dig in three feet and it's a ten by ten area, there's a considerable amount gone. If you take that and take only four inches, and you take it over a 25 by 25 area, it would look a lot bigger." Counsel then read Saunders's deposition testimony: "Well, I know for a fact that on the back side, which would have been on the west side of the pile, that there was

a big chunk missing out of the back, and I assumed that being Schrum's property, he has to know who did it if he didn't do it." Counsel asked if a big chunk was a big percentage, and Saunders replied that it can be either depending on how big the surface is.

{¶41} An additional witness, Christopher Altiere, the owner of CBS, testified during the trial. However, Saunders ordered the transcript that included Altiere's testimony on appeal, not for his objections to the magistrate's decision; thus, we can only consider the summary of Altiere's testimony contained in the findings of fact in the magistrate's decision. Civ.R. 53; App.R. 9.

{¶42} Following a bench trial, the magistrate awarded Acme judgment in the amount of $6,249.89, and Saunders $1.00 in nominal damages. Saunders filed objections to the magistrate's decision, which Acme opposed.

{¶43} On May 14, 2010, the trial court issued a judgment entry adopting the magistrate's decision. The trial court found that R & J and Saunders entered into a valid, enforceable agreement for the removal of the topsoil. R & J, and hence Acme, as purchaser of the receivable, performed its obligations under the contract, and Saunders has failed to perform its obligation of payment without legal justification or excuse. The trial court stated that although Saunders had no contractual agreement directly with Acme, Acme conferred a benefit upon Saunders in the form of trucking services without receiving any compensation. Therefore, the trial court found that Saunders would be unjustly enriched if it was permitted to retain the benefit of those services without paying for them. The trial court further found that the reasonable value of Acme's services was $3,171.88 and together with the receivable of R & J in the amount of $3,078.01, Acme was entitled to judgment in its favor in the amount of $6,249.89.

{¶44} The trial court found that the facts of the case failed to support Saunders's claim for unjust enrichment. With respect to Saunders's conversion claim, the court found that Mosure gave the topsoil to Saunders on the condition that it remove the soil from the field. Saunders had the soil removed from the field but did not pay for the removal services; this failure constituted a contractual breach, not a condition precedent to the enforceability of the contract. The topsoil belonged to Saunders once it was removed from the field. Furthermore, the court found that:

**{¶45}** "[Acme] had no legal right or basis to resort to self-help repossession or prejudgment execution when it removed Saunders's soil from Schrum's property. Even had [Acme] actually sold this soil to Saunders, in the absence of a valid security agreement or writing evidencing a purchase money security interest in the soil, [Acme] had no legal right to remove this soil from Schrum's property and when it did so, it converted Saunder's [sic] property."

**{¶46}** With regard to damages for conversion, the trial court noted that the measure of damages is the value of the converted property at the time it was converted. Saunders had the burden of proving the fair market value of the soil by a preponderance of the evidence, and the court found that Saunders had failed to do so. The trial court explained that all aspects of Saunders's damages calculation were speculative, including the initial amount of soil deposited at Schrum's property, the amount of soil taken by Acme, and the value of the soil taken by Acme. The trial court also noted that the soil remaining on Schrum's property was "unprocessed" and Saunders intended to process it before selling it; however, Saunders did not provide any evidence regarding the cost of processing the soil and, therefore, its unit value at the time Acme converted it in "unprocessed" form. Finally, the trial court found that although Saunders testified it intended to sell the enriched topsoil for $17 per cubic yard, it failed to provide evidence of a contract or name of a customer reflecting a prospective sale. Thus, the trial court found that Saunders failed to sustain its burden of proof on compensatory damages for conversion.

**{¶47}** The trial court found that once conversion is proven, the claimant is entitled to at least nominal damages, and in the absence of evidence of compensatory damages, a court should only award nominal damages. Thus, the trial court found that Saunders is entitled to nominal damages in the amount of $1.00 from Acme for its conversion of Saunders's topsoil.

**Conversion Damages**

{¶48} In the first of two assignments of error, Saunders asserts:

{¶49} "The trial court erred when it awarded only nominal damages after finding that The Acme Company illegally converted topsoil that did not belong to it."

{¶50} Saunders asserts that the trial court abused its discretion in its damages award, specifically by only awarding nominal damages, and argues that the court should have awarded lost profits. An appellate court will not disturb a trial court's determination of damages absent an abuse of discretion. *Roberts v. United States Fid. & Guar. Co.* (1996), 75 Ohio St.3d 630, 634, 665 N.E.2d 664. However, this court has also used a manifest weight of the evidence standard when reviewing a trial court's award of damages. See, e.g., *Mt. Pleasant Volunteer Fire Dept. v. Stuart*, 7th Dist. No. 01 JE 11, 2002-Ohio-5227, at ¶30. Because Saunders requests that this court review the evidence to determine if an award of compensatory damages is appropriate, manifest weight is a more appropriate standard of review.

{¶51} Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, at syllabus. When considering whether the judgment of the trial court is against the manifest weight of the evidence, it is important that the court of appeals be guided by a presumption that the findings of the trier of fact are correct. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. The weight to be given the evidence as well as the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, at paragraph one of the syllabus.

{¶52} In general, "[t]he measure of damages in a conversion action is the value of the converted property at the time it was converted." *Allied Erecting & Dismantling Co., Inc. v. Youngstown*, 151 Ohio App.3d 16, 2002-Ohio-5179, 783 N.E.2d 523, at ¶62, quoting *Tabar v. Charlie's Towing Serv., Inc.* (1994), 97 Ohio App.3d 423, 428, 646 N.E.2d 1132. However, "[t]here is no inflexible rule as to the measure of damages for a

wrongful conversion." *Modarelli v. Fullerton Transfer & Storage Limited, Inc.* (May 30, 1978), 7th Dist. No. 77 CA 128. See, also, *Fulks v. Fulks* (1953), 95 Ohio App. 515, 121 N.E.2d 180, at paragraph two of the syllabus. The Ninth District Court of Appeals held that "[a] plaintiff may recover lost profits for conversion where lost profits may be naturally expected to flow from the conversion and they are reasonably ascertainable." *Digital & Analog Design Corp. v. N. Supply Co. (Digital & Analog I)* (Nov. 25, 1987), 9th Dist. No. 4213, reversed in part on other grounds, *Digital & Analog Design Corp. v. N. Supply Co. (Digital & Analog II)* (1989), 44 Ohio St.3d 36, 540 N.E.2d 1358. See, also, *Schaffer v. First Merit Bank, N.A.*, 186 Ohio App.3d 173, 2009-Ohio-6146, 927 N.E.2d 15, at ¶29.

**{¶53}** Here, lost profits would be expected to result from the conversion. Acme converted topsoil from Saunders, who is in the business of selling topsoil. Saunders had already sold some of the soil from the Canfield football field and had equipment on Schrum's property in order to process the soil in preparation to sell it, which Acme knew about. The issue here, however, is whether the lost profits are reasonably ascertainable.

**{¶54}** In *Digital & Analog II*, the Ohio Supreme Court affirmed the jury's award of lost profits as a component of compensatory damages. Id. at 42. In determining whether the company demonstrated lost profits with reasonable certainty, the Court observed that to prove lost profits, a party must show: "(a) what he would have received from the performance so prevented, but also (b) what such performance would have cost him (or the value to him of relief therefrom). Unless he proves both of those facts, he cannot recover as damages the profits he would have earned from full performance of the contract." *Allen, Heaton & McDonald, Inc. v. Castle Farm Amusement Co.* (1949), 151 Ohio St. 522, 86 N.E.2d 782, at paragraph three of the syllabus. The Court concluded that evidence that fails to meet this standard is speculative and an insufficient basis for an award of lost profits. *Digital & Analog II* at 40.

**{¶55}** Therefore, Saunders needed to show the amount of the soil remaining in June of 2007 that he could have sold, the sale price of the soil, and his costs in processing the soil. Regarding the sale price for the soil, Saunders testified that he usually sells processed soil for $17 per cubic yard. However, he sold processed soil from

the Canfield football field to Foust for $14 per cubic yard because of the quantity sold and the short distance the soil needed to be transported. He further testified that the current value of the soil he sold to Foust was anywhere between $17 and $26 per cubic yard. Thus, Saunders has not proven the value of the processed soil with reasonable certainty.

**{¶56}** Notwithstanding Saunders's evidence regarding the amount of topsoil and its sale price, Saunders has failed to provide any evidence regarding his costs in processing and selling the topsoil. The topsoil stored on Schrum's property was unprocessed, and Saunders testified that he planned to process this soil and mix it with compost before selling it, but failed to provide any evidence on the amount of these costs. Therefore, there is an insufficient basis in the record for an award of lost profits.

**{¶57}** However, as discussed supra, the general measure of damages for conversion is the fair market value of the item at the time it was converted. *Allied Erecting & Dismantling Co.*, supra, at ¶62. "An award of damages must be shown with a reasonable degree of certainty and in some manner other than mere speculation, conjecture, or surmise." *Elias v. Gammel*, 8th Dist. No. 83365, 2004-Ohio-3464, at ¶25. Damages are not speculative when they can be "computed to a fair degree of probability." *Allied Erecting & Dismantling Co.* at ¶65. However, if the appellant "establishes a right to damages, that right will not be denied because the damages cannot be calculated with mathematical certainty." Id. at ¶64, quoting *Hollobaugh v. D&V Trucking* (May 8, 2001), 7th Dist. No. 99 CA 303.

**{¶58}** In order to prove the value of the soil at the time Acme converted it, Saunders needed to prove both the amount of the soil that Acme converted and the unit price of the soil. Saunders first calculated the amount of soil originally removed from the Canfield football field. He based his calculation of hours worked by Acme and R & J on their invoices as stipulated to by Acme. Saunders based the number of loads per hour upon the trip tickets, but not all of the trip tickets recorded the number of loads. Zarlenga also testified that the hash marks on the trip tickets were not precise because the truck drivers might forget to record their loads. This produced a low estimate for the number of loads per hour. Saunders based this calculation using an average load capacity of the

trucks based on information he received from several trucking companies and also upon Zarlenga's testimony regarding the amount his trucks could carry. Again, this figure provided a low estimate of trucks' load capacity. Saunders also calculated the amount of soil he removed from the field based upon the trip tickets and his own knowledge of his trucks' capacity and hours worked. While this calculation of the amount of soil removed from the Canfield football field was not precise, mathematical certainty is not required. Thus, Saunders calculated the amount of soil originally removed from the field to a fair degree of probability.

{¶59} Saunders then calculated the soil remaining on Schrum's property in June of 2007 when Acme converted it, by deducting the amount of soil he sold to Foust, donated to Canfield Township, removed for his personal use, and transported to Barth Farms. Although he testified that he had no records of the soil that he donated and his calculation of this soil varied by 24 cubic yards from his deposition testimony to his trial testimony, again, mathematical precision is not required.

{¶60} Significantly, Saunders testified that soil was removed from the west side of the pile by an unknown party. Although Saunders agreed to use a figure of five percent missing from the pile, this calculation was mere conjecture, based upon simply viewing the pile rather than any definitive calculations. Although he testified that he could judge what percentage was missing based on the contour of the pile, he also stated that it was difficult to judge the depth of the pile. Finally, Saunders testified that he allowed Schrum to take soil from the pile, but he did not know how much Schrum took.

{¶61} Thus, Saunders's calculation of the amount of soil that Acme converted was based upon conjecture. Saunders could only roughly estimate the percentage missing from the west end of the pile and he had no idea how much soil Schrum took. Moreover, Zarlenga testified that the pile of soil remaining in June of 2007 had other soil mixed in, and Saunders did not consider this in his calculation of soil removed from the Schrum property. Although Zarlenga testified that he had trip tickets from June of 2007 when he removed the soil, Saunders's counsel did not subpoena the correct documents. Saunders could have used these trip tickets as a basis to calculate the amount of the soil removed; and it is the appellant's burden to prove its damages with reasonable certainty,

and Saunders here has failed to subpoena the correct documents.

**{¶62}** In addition to proving the amount of soil Acme removed from Schrum's property, it is also Saunders's burden to prove the value of the soil at the time it was converted. His testimony regarding the value of the topsoil he sold to Foust is irrelevant because he sold processed soil to Foust, whereas the basis of his conversion claim is the unprocessed soil removed from Schrum's property. He testified that there is no difference in value between processed and unprocessed topsoil, but then later testified that he does not sell unprocessed soil because he has a machine to process the soil so that customers will not have problems with it. Moreover, Zarlenga testified that unprocessed topsoil is worth less than processed topsoil. As noted in the magistrate's decision, Altiere testified that his company sells unprocessed topsoil for less than it sells his "supersoil." Thus, Saunders's figure of $17 for processed topsoil is not the correct value of the unprocessed topsoil at the time it was converted. Therefore, the trial court properly concluded that the value of unprocessed topsoil is speculative.

**{¶63}** Saunders argues that the trial court erred in awarding him only nominal damages and abused its discretion in finding that the soil had no value. However, the trial court did not find that the soil had no value, but rather found that the value of the soil was speculative: "There is testimony in this case that the unit value of this soil was anywhere from zero to $27.00 per cubic yard, that the market was 'glutted' with soil at the time, and that the soil was worth only what it cost to haul away." Furthermore, a trial court may award nominal damages when "some injury has been done, the extent of which the evidence fails to show." *Lacey v. Laird* (1956), 166 Ohio St. 12, 139 N.E.2d 25, at paragraph two of the syllabus. In a conversion action, if the complainant does not prove compensatory damages, the trial court should only award nominal damages in recognition of the complaining party's right and the violation of such right by offending party. *Fisher v. Barker*, 159 Ohio App.3d 745, 2005-Ohio-1039, 825 N.E.2d 244, at ¶11.

**{¶64}** Thus, since Saunders has failed to prove his damages with reasonable certainty, the trial court did not err in awarding only nominal damages. Accordingly, Saunders's first assignment of error is meritless.

## Unjust Enrichment Damages

**{¶65}** In its second assignment of error, Saunders asserts:

**{¶66}** "The trial court erred when it awarded judgment to The Acme Company."

**{¶67}** Saunders alleges the trial court erred in awarding judgment in Acme's favor for unjust enrichment and for the amount in R & J's accounts receivable. Specifically, that because there was no meeting of the minds between him and Acme there was no contract; and Acme merely sued on an account, it did not set forth a claim for unjust enrichment in its complaint. These arguments will be discussed in turn.

**{¶68}** Saunders is correct that no contract existed between him and Acme. Zarlenga testified that the first time he contacted Saunders was when he sent the invoice to him after the services had already been performed. Thus, the issue remains whether Acme properly asserted a claim for unjust enrichment.

**{¶69}** The Ohio Supreme Court held in *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 465 N.E.2d 1298: "In *Hummel v. Hummel* (1938), 133 Ohio St. 520, 525, 14 N.E.2d 923, this court observed that liability in quasi-contract 'arises out of the obligation cast by law upon a person in receipt of benefits which he is not justly entitled to retain * * *.'" Id. at 183. The Court then adopted the court of appeals' iteration of the elements of a claim for quasi-contract, or unjust enrichment, as "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ('unjust enrichment')." Id. When determining whether there is sufficient evidence to support a claim for unjust enrichment, a reviewing court will not reverse a judgment "supported by some competent, credible evidence going to all the essential elements of the case." *Dixon v. Smith* (1997), 119 Ohio App.3d 308, 318, 695 N.E.2d 284, quoting *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, at syllabus. Finally, Ohio is a notice pleading state, and only requires a complaint to include, "a short and plain statement of the claim showing that the party is entitled to relief, * * *." Civ.R. 8(A).

**{¶70}** In its complaint, Acme alleged in regards to the services it provided

Saunders:

**{¶71}** "1. On or about June 17, 2006, Plaintiff provided services to the Defendant as shown by Exhibits 'A' and 'B' attached hereto and incorporated herein.

**{¶72}** "4. Despite Plaintiff's demand for payment, Defendant has refused to pay the balance due for the services rendered.

**{¶73}** "5. Defendant now owes the Plaintiff the sum of THREE THOUSAND EIGHT HUNDRED FORTY-NINE DOLLARS and 25/100 ($3,849.25) for services rendered to the Defendant by the Plaintiff * * *."

**{¶74}** Applying the Ohio Supreme Court's analysis in *Hambleton*, and the notice pleading requirements of Civ.R. 8(A), Acme has sufficiently pled a claim for unjust enrichment. Acme's complaint alleges that it conferred a benefit upon Saunders, *i.e.,* transporting the excavated topsoil to Schrum's property; Saunders knew of the benefit since he refused to pay for the benefit; and that Saunders had not paid for that benefit. Thus, Saunders would be unjustly enriched for not paying for Acme's services. See also *HLC Trucking v. Harris*, 7th Dist. No. 01 BA 37, 2003-Ohio-694, at ¶24-27.

**{¶75}** Second, Saunders asserts that Acme's purchase of R & J's accounts receivable was not an asset purchase or the negotiation of commercial paper. Saunders further argues that even if it were, this disputed account does not fall under the definition of commercial paper and was not transferable or negotiable pursuant to R.C 1303.03 and R.C. 1303.21. However, this transfer was not a negotiation of commercial paper; but rather, R & J assigned its rights to payment under its contract with Saunders.

**{¶76}** "It is long-standing tradition in the common law that all contract rights may be assigned except under three conditions. First, if there is clear contractual language prohibiting assignment, an assignment will not be enforced. Second, an assignment must not materially change the duty of the obligor, materially increase the insurer's burden or risk under the contract, materially impair the insurer's chance of securing a return on performance, or materially reduce the contract's value. Third, the assignment will not be valid if it is forbidden by statute or by public policy." *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 112 Ohio St.3d 482, 2006-Ohio-6551, 861 N.E.2d 121, at ¶36.

**{¶77}** There was nothing in the contract between Saunders and R & J prohibiting assignment, and this assignment of payment rights did not materially change Saunders's duty because Acme sought payment for the account receivable in its complaint in the same amount of the services that R & J provided to Saunders. Only the right to payment was assigned; the services had already been performed and the assignment did not change the contract's value. Furthermore, the assignment of an accounts receivable does not appear to be forbidden by statute or by public policy. See *Schofield v. Benton* (Aug. 20, 1992), 10th Dist. No. 92AP-161 (upholding assignment of the contractual right to collect payment for services that had already been performed). Accordingly, Saunders's argument regarding Acme's unjust enrichment claim and the judgment on the accounts receivable are meritless.

**{¶78}** In sum, Saunders's arguments are meritless. Saunders did not prove lost profits damages with reasonable certainty because it failed to provide any evidence as to its costs in processing the topsoil and the sale price of the topsoil appeared to be speculative. Saunders also did not sufficiently prove general conversion damages because its evidence regarding the amount and value of the unprocessed topsoil was speculative. Acme sufficiently pled a claim for unjust enrichment, and R & J properly assigned its right to payment from Saunders to Acme. Accordingly, the judgment of the trial court is affirmed.

Waite, P.J., concurs with attached concurring opinion.

Vukovich, J., concurs.

Waite, P.J., concurring.

**{¶79}** Although I agree with the majority's interpretation of the procedural issues in this case, as well as most of the legal principles cited, there is an additional legal framework that I would add that helps explain the final decision in this appeal. A brief recitation of some of the relevant facts follows: David Mosure, working for Canfield High

School, gave Saunders permission to haul away topsoil from the school football field as new turf was being installed. Saunders had two days to haul the dirt away. Saunders then entered into an oral contract with R&J Trucking to perform the actual hauling. Saunders and R&J disagreed over the number of trucks necessary for the project, but R&J was ultimately responsible for doing the hauling. R&J concluded that it would take six trucks, but R&J could not provide all the trucks needed.

{¶80} R&J then entered into an arrangement with Acme to provide three additional trucks for the project. Although Daniel Zarlenga, the president of Acme, testified that he did not contract with R&J to work on the project, it is difficult to interpret the facts in the overall record to reflect anything other than that Acme was operating as a subcontractor for R&J. Acme worked on the project under the terms of the contract that R&J had with Saunders, and at the request and authority of R&J.

{¶81} The project utilized six trucks over the course of two days. Saunders did not pay either R&J or Acme for the hauling services that were performed. R&J sent Saunders a bill for $3,078.01. Acme sent Saunders a bill for $3,849.25. R&J then assigned its breach of contract claim to Acme, and Acme paid R&J $3,078.01 for that assignment. A lawsuit ensued in which Acme attempted to recover the money owed to R&J, as well as asserting a claim of unjust enrichment for the use of Acme's three trucks during the project.

{¶82} I would characterize these facts from the following legal perspective: The $3,078.01 that Acme paid to R&J appears to have been the consideration given on an oral assignment of a chose of action based on a breach of contract. An assignment is

defined as a transfer to another person of the whole of any property or right therein. Black's Law Dictionary (6th Ed.1990) 119. A valid assignment may be oral or written, and should satisfy the requirements of a contract, i.e., the legality of object, capacity of parties, consideration, and meeting of the minds. 6 Ohio Jurisprudence 3d (2011), Assignments, Section 25. An assignment, no matter how informal, may be found when there is intent on the part of the assignor to assign the rights in question, an intent on the part of the assignee to be assigned the rights in question, and valuable consideration exchanged. Id.; see also, *Morris v. George C. Banning, Inc.* (1947), 77 N.E.2d 372, 374, 49 Ohio Law Abs. 530.

**{¶83}** "Any right of action arising out of contract may be assigned. 6A Corpus Juris Secundum (1975) 641, Assignments, Section 36. Furthermore, 'any words or transactions which show an intention on one side to assign and an intention on the other to receive, if there is a valuable consideration, will operate as an effective equitable assignment.' *Morris v. George Banning, Inc.* (App.1947), 49 Ohio Law Abs. 530, 533, 77 N.E.2d 372, 374." *Langhals v. Holt Roofing Co.* (1988), 47 Ohio App.3d 114, 116, 547 N.E.2d 401; see also *Farley v. Gary Nichols Builders*, 9th Dist. No. 99CA007530.

**{¶84}** Acme also sued Saunders for its own work as a subcontractor on the project. This claim was correctly brought as an unjust enrichment claim. When a subcontractor is not paid by the contractor and the owner has not paid the contractor for some aspect of the job at issue, the subcontractor can look to the owner for payment under a theory of unjust enrichment. See *Meridien Marketing Group, Inc. v. J&E Bldg. Group, Inc.*, 2d Dist. No. 2011-CA-02, 2011-Ohio-4872; *Ross-Co Redi Mix Co. v.*

*Steveco, Inc.* (Feb.6, 1996), 4th Dist. No. 95CA3; *Brower Prods. Inc. v. Musilli* (May 21, 1999), 2d Dist. Nos. 98CA58 and 98CA59.

**{¶85}** Since there are two distinct claims that are before us, the majority Opinion is correct in discussing both a contract claim (along with the assignment of that claim), and an unjust enrichment claim. However, the majority interprets the facts so that the unjust enrichment claim is independent of the contract claim and glosses over the question of assignment, whereas I interpret the two claims as interrelated. However we look at the facts, though, the majority and I agree that there are two issues raised by Acme, here, one for breach of contract and one for unjust enrichment, and judgment was properly granted in favor of Acme on both claims. I concur with the majority on all other matters discussed in the Opinion.